# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHERMEKE PERKINS,           )
      Plaintiff,            )
                            )
VS.                         )  Civil Action No. 4:11-cv-00442
                            )
PROMOWORKS, L.L.C.,         )
      Defendant.            )

# ORIGINAL

*******************************************

ORAL DEPOSITION OF SHERMEKE PERKINS
April 14, 2012

*******************************************

ORAL DEPOSITION OF SHERMEKE PERKINS, taken on the

14th of April, 2012, from 9:00 a.m. to 3:52 p.m., before

Paula A. Lucchesi, CSR in and for the State of Texas,

reported by machine shorthand, taken at Fulbright & Jaworski,

L.L.P., 1301 McKinney, Suite 5100, Houston, Texas, 77010,

pursuant to Texas Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

Page 10

1   with the EEOC or a state such as the Texas Human Rights

2   Commission?

3       A.   **No, ma'am, I have not.**

4       Q.   Have you ever complained internally to an H.R.

5   department or manager about discrimination or harrassment at

6   any employer other than PromoWorks?

7       A.   **No, ma'am, I have not.**

8       Q.   Have you ever been terminated involuntarily by any

9   employer other than PromoWorks?

10      A.   **Can you rephrase the question, please?**

11      Q.   Yes.  Have you ever been fired from an employer

12  other than PromoWorks?

13      A.   **No, ma'am, I have not.  I have been involuntary with**

14  **a layoff, a centralization, but not discharged or fired.**

15      Q.   Okay.  And what companies were you laid off from?

16      A.   **That would have been Safeway, Randalls -- the**

17  **Randalls division of Texas.**

18      Q.   Okay.  The employer you worked for just before

19  working for Star Chambers?

20      A.   **PromoWorks, yes, ma'am.**

21      Q.   And just so we are clear, Star Chambers is an

22  affiliated company with PromoWorks?

23      A.   **Yes, they were.**

24      Q.   Or it was at the time, at least?

25      A.   **Yes, ma'am.**

Thompson Court Reporters, Inc
(312) 421-3377

1      Q.   Have you ever testified as a witness in court

2   before?

3      A.   **No, ma'am, I have not.**

4      Q.   Are you in contact with any current PromoWorks

5   employees at this time?

6      A.   **No, I am not.**

7      Q.   How about any former PromoWorks employees?

8      A.   **No, I am not.**

9      Q.   Let me start with just some basic background about

10   your employment with PromoWorks, which would have begun

11   initially at Star Chambers, right?

12      A.   **Yes.**

13            **(Perkins Exhibit No. 1 was marked.)**

14      Q.   I am handing you Perkins 1 which appears to be your

15   offer letter for Star Chambers dated October 27th, 2004.

16   Does that look like what it is?

17      A.   **Yes, it does appear to be.**

18      Q.   Okay.  And your start date was November 1st, 2004 as

19   stated; is that correct?

20      A.   **Yes, ma'am.**

21      Q.   Your starting salary was $43,500 as stated?

22      A.   **Yes, ma'am.**

23      Q.   And your job title was in-house demo coordinator for

24   Randalls, yes?

25      A.   **Yes, ma'am.**

1    Q.   Did you work in a Star Chambers office or did you

2    work inside the Randalls store?

3    **A.   I worked inside the Randalls headquarters, the**

4    **corporate office here in Houston.**

5    Q.   Okay.  Your starting salary of $43,500, did that

6    remain unchanged until you received an increase in 2007 from

7    PromoWorks, or did you get a raise before that?

8    **A.   There was a raise before that.**

9    Q.   Do you recall what your initial raise was, what your

10   first raise was?

11   **A.   I don't recall the raise at this time.  I just know**

12   **that one was -- I can't recall.  Maybe it was a five percent**

13   **raise, but I can't recall exactly.**

14   Q.   And was that raise given to you while you were still

15   at Star Chambers or when you went over to PromoWorks?

16   **A.   That would have been given while I was at Star**

17   **Chambers.**

18   Q.   Did you receive any other raises at Star Chambers

19   other than the initial approximately five percent raise?

20   **A.   Not that I recall at this time.**

21   Q.   And then when did you go over to PromoWorks?

22   **A.   I don't recall the exact date at this time, but they**

23   **completed a merger, and with that merger I was then put on**

24   **PromoWorks.  I believe -- I don't want to speculate, but I do**

25   **believe it was around 2006.**

1      Q.    Okay.  Do you remember if it was early in 2006 or

2    late in 2006?

3      **A.    I don't recall at this time.**

4                   **(Perkins Exhibit No. 2 was marked.)**

5      Q.    I am handing you Perkins 2 which is numbered at the

6    bottom PW-0028.  Do you recognize this?

7      **A.    Yes, ma'am, I do.**

8      Q.    What is it?

9      **A.    It's my resume.**

10      Q.    Okay.  And was this -- do you recall when you

11    prepared this resume?

12      **A.    I believe this was prepared prior to me leaving**

13    **Safeway, so it was -- or Randalls, so it was done prior to me**

14    **leaving because I was given advanced notice that I would be**

15    **laid off and centralized, and I was given advanced notice to**

16    **prepare for that.**

17      Q.    Okay.  Was this the resume you prepared when you got

18    a job at Star Chambers?

19      **A.    Well, this was already prepared.  I just added my**

20    **current duties that I had been performing with Safeway to it.**

21      Q.    Okay.  Was this the resume that you gave to Star

22    Chambers when you interviewed for employment with them in

23    2004?

24      **A.    Yes, it is.**

25      Q.    Okay.  And your employment history that's listed on

1    the second page, PW-0029, is that accurate?

2       A.   Yes, that is accurate.

3       Q.   And the experiences and additional skills, is that

4    accurate?

5       A.   Yes, it is.

6       Q.   And then back to the first page, 0028.  The work

7    experience and qualifications, was that accurate at the time?

8       A.   Yes, it was.

9       Q.   And there was no other employment you held between

10   Randalls, where it says "1997 to present," and the time you

11   became employed by Star Chambers?

12      A.   Correct.

13           MS. STAHR:  I may have given you the wrong

14   exhibit.  I did give you the incorrect exhibit.  I am sorry

15   about that.  This was the letter that I was showing her.

16           MS. JENNINGS:  Okay.

17           MS. STAHR:  That's Exhibit 1.

18           MS. JENNINGS:  Okay.

19           (Perkins Exhibit No. 3 was marked.)

20      Q.   Perkins Exhibit 3 is No. PW-0042, and then behind

21   that is No. PW-139 through 1440.  The first page, 0042, do

22   you recognize that?

23      A.   Yes.

24      Q.   What is it?

25      A.   That's my signature acknowledging that I have read

1    **over the handbook.**

2        Q.    Okay.  And do you see the date at the bottom of that

3    page?

4        **A.    I do.**

5        Q.    What is that date?

6        **A.    It says September 12th, 2006.**

7        Q.    Okay.  And is that the date that you wrote next to

8    it?  It's a little difficult to read.

9        **A.    Yes, it appears to be.**

10       Q.    And then the policy manual behind it, is that the

11   manual you received that you signed an acknowledgment of?  It

12   says on the bottom "updated September 2006" which would have

13   been the month that you signed it.

14       **A.    Without reading through it and knowing exactly what**

15   **I had read before, it appears to be the manual that I signed**

16   **off on.**

17       Q.    Okay.  And did anybody discuss vacation pay policies

18   with you at PromoWorks when you were hired on at PromoWorks

19   other than what's in the manual?

20       **A.    Other than what's in the manual, no.**

21       Q.    Okay.  How about personal leave or sick leave

22   issues?  Other than what's in the manual, did anybody discuss

23   those issues with you?

24       **A.    No, they did not.**

25       Q.    How about payment for sick time or personal time or

Page 19

1     A.    I was the liaison for the Randalls division which

2   consisted of the Houston, Austin and Dallas areas.   That

3   meant dealing with the suppliers and the vendors, also being

4   the chain of command from the PromoWorks headquarters as well

5   as the Star Chambers headquarters for the Randalls division

6   office.   I communicated with the stores and with the local

7   agencies in Houston, Austin and Dallas as well.

8     Q.    What did that involve on a day-to-day basis?   Were

9   you sitting in a Randalls store on the phone most of the time

10  or were you -- what was your day like on a typical day?

11    A.    It was a very busy day.   Considering that I had the

12  entire Texas division, I was constantly on the phone with

13  suppliers and vendors and soliciting for sampling events,

14  also coordinating these sampling events, making sure that

15  notifications were -- the stores were notified by typing up

16  e-mail notifications and notifying them of their sampling

17  events.

18        I also ran scan data on those sampling events.   We

19  did detailed reporting to report back to the suppliers on

20  their -- the effectiveness of their events, the execution of

21  their events.   Also I communicated that information on a

22  weekly basis to the Randalls headquarters to let them know

23  how the sales affected or were impacted from the events that

24  happened over that period of time, so --

25    Q.    And what was your work week or workday hours like,

Page 22

1     A.    No, just Cindy McGettigan.

2     Q.    Did anybody interview you when you became a

3   PromoWorks employee as a result of the merger?

4     A.    No.

5     Q.    Did you have to go through an interview process?

6     A.    No.

7     Q.    Okay.  Describe the alcohol-related responsibilities

8   that grew in your position.  What were those about?

9     A.    When I came on board in 2004, the only program that

10   PromoWorks had at the time -- and I am saying PromoWorks

11   because, again, they were in the process of the merger, and I

12   did deal with them on a day-to-day basis other than Star

13   Marketing.  They only had food sampling events.  That's all

14   that they were handling at that time.

15          Well, in 2005 -- and as a matter of fact, in October

16   of 2005, alcohol sampling was legalized in retail chains in

17   Texas, and so I saw that as an opportunity to bring that side

18   of the business into PromoWorks.  And I was actually getting

19   requests from vendors that I had previously worked with in my

20   Safeway experience.

21          They knew that I was there in that office, so they

22   knew that I knew the legalities because that's something that

23   I -- my background -- from my previous background I had

24   worked with.  And they came to me because they knew that I

25   was responsible for the food demos and the food sampling, and

1    I was the point person in the Safeway office for any type of

2    sampling that went on in the stores.

3            So they requested that if we could start setting up

4    some type of alcohol samplings because it was now legalized.

5    So when I brought this to Joe Szala and Cindy McGettigan and

6    Mike Kent, they didn't -- they weren't aware of what was

7    going on in Texas, and this was nowhere across the board in

8    the other divisions.

9            They had never dealt with that before.  They didn't

10   know where to start with that.  So they asked me to go out

11   and look -- research the legalities and to bring this back to

12   them and, you know, see what I can find out about setting

13   this up.

14       Q.   Okay.

15       A.   And that's what I did.

16       Q.   Okay.  So the store, Safeway or Randalls, started

17   talking to you about doing this?

18       A.   Uh-huh.

19       Q.   And then you brought it to Mike Kent and Cindy

20   McGettigan and Joe Szala?

21       A.   Uh-huh.

22       Q.   And you thought it was a good idea?

23       A.   Uh-huh.

24       Q.   And they did, too, apparently?

25       A.   Uh-huh.

1          MS. JENNINGS: Verbalize it with a yes.

2     **A.    I am sorry.  Yes, ma'am.**

3     Q.    (By Ms. Stahr)  All of your "uh-huh's" were yes's?

4     **A.    Yes, ma'am.**

5     Q.    Okay.  And that's how this aspect of your job

6     materialized?

7     **A.    Yes, ma'am.**

8     Q.    Okay.  And so let me just march through some of

9     these documents here.

10          (Perkins Exhibit No. 4 was marked.)

11     Q.    Perkins 4 is Document PW-0032 and 0033.  It is a

12     letter dated August 23rd, 2007 to you signed by Frank Colosi

13     and a copy to Joe Szala, yes?

14     **A.    Yes, it is.**

15     Q.    Is this the letter that you received -- I will use

16     the word "formalizing" your title and your wine and spirits

17     role with the company?

18     **A.    This is -- I don't agree with that at this time, no.**

19     Q.    Okay.  How would you describe what you have in front

20     of you as Perkins Exhibit 4?

21     **A.    This -- this was generated after I had already been**

22     **-- I had already consumed the duties.  I had already consumed**

23     **the duties, had taken on the title, had taken on many roles.**

24     **I had -- I was working three other job titles at this time**

25     **before this offer was generated, and it was actually**

Page 25

1    generated due to a resignation that I put in.

2        Q.   Okay.  Well, let's talk about the resignation.  What

3    -- what was the impetus for you writing a resignation letter

4    or informing someone that you wanted to resign?

5        A.   After I developed the program in 2005 for Texas,

6    Safeway division approached Mike Kent and Joe Szala with

7    going with the program that was developed in Texas

8    nationally.  They wanted to roll it out nationally in all of

9    the divisions because of the profits that they were seeing

10   out of the Texas division.

11              At that time I was approached by Joe Szala with word

12   from Mike Kent that they wanted me to head this project up.

13   Since I had done all the research for Texas, they wanted me

14   to research every single division across Safeway and come up

15   with -- basically implement a program that would be effective

16   across the board.

17              And with that being said, he offered me an increase

18   in pay and a title change as well as a bonus.  And this was

19   offered to me in October of 2006, which is when I started

20   working on the project.  And in 2006, October of 2006, I

21   began working on researching all the legalities.

22              I researched, I would say, about ten states

23   including Hawaii and Canada.  I came back with all the

24   research.  I was involved in every aspect of the business now

25   from the -- the dress code, the look of the whole program,

1  had found, so I was consuming more responsibility and no pay

2  increase.

3      Q.   So you felt like you were -- you wanted more money

4  for the job you were doing?

5      A.   It wasn't that I wanted more money for the job I was

6  doing.  I had consumed three job titles and I was only being

7  paid for one.  I was only being paid to be an in-house demo

8  coordinator.  He had promised that if I researched these

9  legalities and we got a contract with Safeway, that my job

10  would be changed -- my title would be changed, I would be

11  given a bonus and I would be given a pay increase --

12      Q.   I understand --

13      A.   -- for all of my research --

14      Q.   I understand what you have explained at length.

15      A.   -- and he did not -- he did not honor this.

16      Q.   So let's talk about your belief that you assumed

17  several job titles.  Was there a job title called Safeway

18  Wine and Spirits Lead before you took it on?  Was there a

19  person who staffed that position?

20      A.   No, there was not.

21      Q.   Was there any job title in existence before you

22  assumed that role?

23      A.   No, there was not.

24      Q.   That was a new role created for you, essentially,

25  right?

Page 29

1       A.    There was a lead role, but it wasn't for alcohol.

2   It was a lead role for food which done the same -- had the

3   same job responsibilities and roles.

4       Q.    I am asking you about the lead role for alcohol, the

5   same role that you had.  Was there anybody performing that

6   role before you?

7       A.    No, because they didn't have the program.

8       Q.    Okay.  And then the second job you believe you held

9   was your original in-house demo coordinator position?

10      A.    Yes, ma'am.

11      Q.    And then what was the third job title you think you

12  held?

13      A.    It was account manager.  I was point person for

14  Safeway corporate, so I handled all the Safeway supplier

15  demands and needs and also sold demo events, which was a part

16  of the sales team.

17      Q.    So the account manager was handling the Safeway

18  supplies for the demonstrations?

19      A.    No, ma'am, they were handling the sales.  They would

20  go out and solicit sales from the vendors and suppliers and

21  also coordinate the events and make sure and follow through.

22  And it was a more extensive role from the in-house

23  coordinator.  The in-house coordinator's job was to follow up

24  on these events.  The sales account manager was the person

25  who actually went out and sold the demo events, and that's

Thompson Court Reporters, Inc
(312) 421-3377

1    **what I did.**

2        Q.   And when did you start doing that?

3        **A.   I started that right away in December of 2006 once**

4    **the program was implemented.**

5        Q.   Okay.  On this letter here, PW-32, and let's look at

6    the next page, 33 --

7        **A.   Uh-huh.**

8        Q.   -- is that your signature on that letter?

9        **A.   Yes, it is.**

10       Q.   Okay.  So in this letter it says you are working in

11   the position of Safeway Wine and Spirits Lead, slash,

12   In-House Demo Coordinator, Randalls and Tom Thumb?

13       **A.   Uh-huh.**

14       Q.   And those are the -- that's the job title

15   description, correct?

16       **A.   That's the job title that they gave me at the time,**

17   **yes.**

18       Q.   Okay.  And you received a salary increase?

19       **A.   Yes, I did, but not when it was supposed to be**

20   **effective.**

21       Q.   Okay.  We will talk about the timing in a moment.  I

22   want to talk about what's on this letter for right now.  The

23   salary increase was to $57,000; is that right?

24       **A.   That is correct.**

25       Q.   What salary were you earning just prior to this?

1      A.   I don't recall at this time.

2      Q.   Was it in the 40's?

3      A.   Yes, ma'am, it was in the 40's.

4      Q.   And the letter also says, "You will also be eligible

5  for a bonus plan of 10 percent of your 2007 salary,

6  approximately $5200, on a prorated basis, 5700 in 2008, for a

7  total opportunity of $62,200."  Is that what it says?

8      A.   That's what it says, yes, ma'am.

9      Q.   How do you understand the word "opportunity"?  What

10  do you understand that to mean?

11     A.   Opportunity means that it can be $62,200.

12     Q.   But not necessarily?

13     A.   That's not what -- this is not what was verbally --

14  verbally noted in my original intent to take this position.

15  This is not what -- when they typed it up, this is what they

16  put, opportunity.  But when they verbalized it to me, that is

17  not what they verbalized to me.

18     Q.   Well, this is the letter that you signed, though,

19  correct, and it has "opportunity" in there?

20     A.   It has opportunity, but this is not what was

21  verbalized to me.  It also had -- it doesn't have anything in

22  here about goals, and they attached goals to that.

23     Q.   To what?

24     A.   To this bonus.

25     Q.   To the bonus opportunity?

1      A.    **Exactly.**

2      Q.    And that was provided to you at a different time,

3   correct?

4      A.    **Yes.**

5      Q.    Okay.  And you accepted this position as stated on

6   PW-0033?

7      A.    **Yes, I did.**

8      Q.    Who did you inform that you wanted to resign before

9   this letter was drafted to you?

10      A.    **I sent that to Joe Szala, Mike Kent, Denise Decker**

11   **and Jon Bos as well as Frank Colosi.**

12      Q.    And who responded to you after you sent that

13   letter?

14      A.    **Joe Szala responded to me immediately.**

15      Q.    He called you on the phone?

16      A.    **He called me on the phone.  He also sent me an**

17   **e-mail and wanted to negotiate and keep me on board with the**

18   **company.**

19      Q.    He wanted you to stay?

20      A.    **He wanted me to stay.**

21      Q.    Did you feel he was trying to get rid of you or get

22   you to leave the company for any reason at that point?

23      A.    **At that point I did not.**

24      Q.    How about Frank Colosi or Denise Decker or Jon Bos

25   or Mike Kent?

Page 41

1    folks on here held these positions?

2              MS. JENNINGS:  Objection, form.

3        **A.   Can you repeat the question, please?**

4        Q.   (By Ms. Stahr)  I understand that you disagree with

5    the roles that are stated on here for you personally.

6        **A.   Uh-huh.**

7        Q.   Do you disagree with any of the roles stated on here

8    for anybody else?

9        **A.   I don't disagree with them.**

10              **(Perkins Exhibit No. 7 was marked.)**

11       Q.   Okay.  So let me show you Perkins 7 which is

12   numbered Plaintiff Dep, that's P-1, period, d-e-p, period,

13   001 through 012.

14       **A.   Uh-huh.**

15       Q.   And I received this from your attorney.  What is

16   this?

17       **A.   This appears to be my grievance complaint.**

18       Q.   To whom?  Is this something you wrote down for

19   yourself or did you give this to someone?

20       **A.   This appears to be -- without a cover, I really**

21   **can't recall who this was addressed to.**

22       Q.   Did you write this document?

23       **A.   Without reading everything, I can't say that I wrote**

24   **everything in this document, but it appears to be the**

25   **document that I did write, yes.**

Page 46

1        A.    At the time I thought that they were going to --

2   they were going to honor their verbal promise to me, and they

3   didn't.

4        Q.    The next entry is December of 2006, do you see that?

5        A.    Uh-huh.

6        Q.    Briefly describe what you write about there.

7        A.    "I was acting and performing the new job position

8   responsibilities of the Safeway alcohol sampling manager,

9   in-house demo coordinator, Safeway alcohol sales account

10  manager and Phoenix division coordinator as well as acting as

11  legal ABC tasting expert."

12            "I inquired about the proposed pay increase and

13  title change prior to a major presentation that I was flown

14  out of town to present, and I was told that the increase

15  still had not been addressed and approved by the V.P., but

16  that he will work on it," he meaning Joe Szala, "and let me

17  know.  I gave the major tasting program presentation to

18  Safeway and it was accepted."

19        Q.    So you documented this because you were still

20  waiting for your pay increase and title change, and you

21  hadn't received it yet?

22        A.    And I had already consumed the roles and

23  responsibilities of that job title in 2006.

24        Q.    Did you feel at that time in December of 2006 that

25  you were being discriminated against?

1   **A.   Yes.   I began to feel that way, yes.**

2      Q.   February 1st, 2007 describes how -- and I am going

3   to summarize here, but you can take your time and read this

4   and -- well, why don't you do that first.   Just read it to

5   yourself.

6      **A.   Okay.**

7      Q.   This describes Joe Szala letting you know just

8   before a presentation that you were to give to coordinators

9   that he was giving you a promotion with a pay increase?

10     **A.   Yes, ma'am.**

11     Q.   And he wanted to announce it to the in-house

12  coordinators?

13     **A.   Yes, ma'am.**

14     Q.   Did you have a problem with that?

15     **A.   I did have a problem with that at the time because I**

16  **feel like I haven't seen what you are going to offer me.   Why**

17  **should I accept -- because you have already told me verbally**

18  **months before that I was going to receive an increase in pay**

19  **and a title change, but we are already two months, three**

20  **months into this job position, and I have taken on all the**

21  **roles and responsibilities, and you haven't honored it yet,**

22  **but now you want me to believe you now so you can announce my**

23  **promotion to the in-house coordinators.**

24          **And he put me on the spot and he made me accept the**

25  **position prior to me knowing what I was going to be making.**

1    coordinators?

2        A.   **I did not object because he told me that I had**

3    **received my pay increase without telling me the amount of the**

4    **pay, so I was assuming that it was the increase that I had --**

5    **we had spoke of with the bonus.**

6        Q.   All -- my -- all I am trying to find out is whether

7    you verbally told Joe you did not want him to tell the

8    coordinators, not why you did or didn't but just if you did.

9            MS. JENNINGS:   Objection.   I think she answered

10   your question.

11       Q.   (By Ms. Stahr)   And the answer to that is no, you

12   did not?

13       A.   **No, I did not.**

14       Q.   Did you feel at the time that you were being

15   discriminated against in this instance?

16       A.   **Yes, I did.**

17       Q.   From April to June of 2007, and we are looking at

18   Plaintiff's Dep 002, take a moment to read that paragraph,

19   please.

20       A.   **What paragraph are we looking at again?**

21       Q.   April to June of 2007.

22       A.   **Okay.**

23       Q.   Does this describe how you were feeling overworked

24   and you asked Joe Szala for help?

25       A.   **I had consumed the roles of three job duties as well**

Page 50

1    as playing legal expert and tasting expert for all of the

2    Safeway division as well as for PromoWorks.  Yes, I was

3    overwhelmed.

4         Q.   But I am asking if this paragraph describes you

5    telling Joe that you were feeling overworked and you were

6    asking him for help.

7         A.   Joe promised that he would give me help when I took

8    the position, that there would be someone else to help me

9    with the position.  We had various conversations prior to

10   April about him taking off responsibilities -- since I had

11   consumed all these duties, he was going to take some

12   responsibility off of my desk, and that hadn't happened.

13        Q.   Okay.  So from April to June of 2007, does this

14   paragraph describe you explaining to Joe your feeling

15   overworked and Joe telling you that he would try to help?

16        A.   I did make a complaint to Joe, yes, uh-huh.

17        Q.   A complaint that you were feeling overworked?

18        A.   No, I made a complaint that I had more than enough

19   responsiblility on my desk because I had three separate job

20   duties -- three separate job titles, I meant, and was he

21   going to actually take some of that responsibility away since

22   I had consumed a new job title.

23        Q.   Okay.  And he said that he was going to send Denise

24   Decker to help?

25        A.   Yes.  At the time Denise was his assistant, and she

Page 51

1    was working beside him.

2         Q.   Did you feel during this time period, April to June

3    of 2007, that you were being discriminated against?

4         A.   At that time I did feel that I was being

5    discriminated against because I was constantly being put --

6    more responsibility was constantly being thrown my way on top

7    of my regular job roles and responsibilities, and I was

8    expected to meet all of my -- my duties and roles.  And yes,

9    I felt that way because it was like I was asking for help and

10   he wasn't listening.

11        Q.   And you believe that was because of your race or

12   your gender --

13        A.   I do.

14        Q.   -- or both?

15        A.   Because I think that they took my hard work and my

16   ethic and used it as a tactic to get me to do all these job

17   titles because they knew I was wanting to grow within the

18   company.  And in order for them to use me that way, they made

19   me feel like what I was doing was important and that I was

20   the only person who could do it, and that's why they

21   continued to throw responsibility on my desk.  And yes, I

22   felt overwhelmed.

23        Q.   Why did you feel that it was related to your race?

24        A.   Because no other in-house coordinator as well as

25   lead -- Jen was a lead as well.  She -- she didn't even have

Page 52

1    this type of responsibility at all.  Her job was strictly to

2    be the lead for in-house coordinators, which is what -- the

3    role that they actually gave me.

4            I was to be the lead and be a mentor -- or not

5    really a mentor.  I was just to be a lead and help where

6    necessary, but that's not what my role was about.  That was

7    the title that they gave me, but that's not what my role

8    entailed.

9        Q.  What about your gender?  Why do you believe this was

10   being -- that this was happening because of your gender?

11       A.  Because again, Jennifer Burgess also had a lead

12   role, and in Jennifer Burgess' lead role, she -- I am sorry,

13   Steven Plunkett, he was given a promotion the same time I was

14   given a promotion.  And with his promotion, he was put on the

15   bonus plan and some of his duties were removed from his desk,

16   but mine still remained the same and were much more heavier.

17           I mean, he -- he had minimal job duties and

18   functions to do, but I was sitting over here with three

19   different job titles and hadn't even received my pay increase

20   for it, so --

21       Q.  Do you know what Steve Plunkett's salary was?

22       A.  I don't know what Steve Plunkett's salary was at the

23   time.

24       Q.  Were you involved in hiring Steve Plunkett?

25       A.  No, I was not.

Page 54

1    was part of Jennifer Burgess' job.

2        Q.    Would it surprise you to learn that Steve Plunkett

3    in 2008 was earning more than $10,000 less than you?

4        A.    That -- at the time, that was -- I was hired in at

5    more than anybody within the company.  So that doesn't

6    surprise me, because when I was hired in, I was hired in

7    according to the skills that I had with Safeway and the

8    relationship that I had with Safeway, and that's why I was

9    brought in and making more than anybody else.  So no, it

10   doesn't surprise me.

11       Q.    Your salary was higher than anybody else?

12       A.    When I started with the company, yes.  That's why my

13   salary ended up being higher than everybody else's, because I

14   was hired in at more than everybody else.

15       Q.    Okay.  So going to -- back to Perkins Exhibit 7, the

16   second page, the July 5th, 2007 entry, this is when Denise

17   Decker came to Texas and sat with you for -- for a period of

18   time?

19       A.    This was the initial time that I met her or the

20   second time that I had met her.  I met her once in

21   Sacramento, and then she flew down this day to introduce

22   herself.

23       Q.    Did you have a problem with that meeting with her or

24   the time she spent with you?

25       A.    I didn't have a problem with it because she told me

Page 61

1    with these long answers.

2        A.    Uh-huh.

3        Q.    So I am trying right now just to confine the

4    question and the answer to money amounts.  So let me start.

5    You received a seven percent increase -- I believe you just

6    said you received a seven percent increase in -- was it April

7    of 2007?

8        A.    No, in February of 2007.

9        Q.    Okay.  And then did you receive a $500 bonus in

10   January or February of 2007?

11       A.    That was -- yes, a holiday bonus, I believe.  And I

12   don't recall that, so I am going to say no because I don't

13   recall that.

14       Q.    Okay.

15       A.    I don't at this time.

16       Q.    You deny receiving a bonus in January or February of

17   2007?

18       A.    I don't recall at this time.

19       Q.    So after the seven percent increase --

20       A.    Uh-huh.

21       Q.    -- in February of 2007, what is the next bonus or

22   pay increase you received?

23       A.    On August 23rd of 2007.

24       Q.    And that is when the --

25       A.    That was in an offer letter.  I didn't actually

Page 62

1   receive it, but it was in an offer letter.

2       Q.   So that is what is conveyed in Perkins Exhibit 4,

3   the letter dated August 23rd, 2007, right?

4       A.   Yes.

5       Q.   Okay.  And I understand there was a pay period that

6   was missed in terms of when that bonus -- or the increase in

7   salary was paid to you?

8       A.   Exactly.

9       Q.   How many pay periods?

10      A.   It was one -- it was -- it wasn't given to me on the

11  effective pay period, but it was effective on -- September

12  the 24th is when I received it.

13      Q.   Of 2007?

14      A.   Of 2007.

15      Q.   Okay.  So other than the seven percent increase in

16  February of 2007 and the increase that you received in

17  September of 2007, did you receive any other increase or

18  bonus in 2007 that you recall?

19      A.   No, I did not.

20      Q.   How about in December of 2007, did you receive a

21  $500 bonus then?

22      A.   I don't recall.

23      Q.   And I take it that you believe that you should have

24  received a bonus in 2007, correct?

25      A.   I was promised a bonus in 2007.

Page 65

1      Q.    Okay.  It's your assumption that Joe Szala, Jon Bos

2   and Mike Kent denied you a bonus, but you don't know for a

3   fact who was responsible for that?

4              MS. JENNINGS:  Objection, form.

5      A.    I can't assume that.  I can only tell you that Joe

6   promised me a bonus, and he said that it had gotten approved

7   by the V.P. which was Jon Bos at the time.

8      Q.    (By Ms. Stahr)  Okay.  At what point did you feel

9   you were -- well, strike that.

10             Did you feel you were being discriminated against

11  based on your race and your gender because you were not given

12  a bonus in 2007?

13             MS. JENNINGS:  Objection, form, it's compound.

14     A.    Yes.

15     Q.    (By Ms. Stahr)  Did you feel you were being

16  discriminated against based on your race because you did not

17  receive a bonus in 2007?

18     A.    Yes, ma'am, I do feel that.

19     Q.    Did you feel that at the time in 2007?

20     A.    Yes, ma'am, I did feel that.

21     Q.    And did you feel that you were being discriminated

22  against based on your gender because you did not receive a

23  bonus in 2007?

24     A.    Yes, ma'am, I did feel that --

25     Q.    At the time?

Thompson Court Reporters, Inc
(312) 421-3377

Page 66

1     A.    -- because again, Steve Plunkett had been put on the

2    program around the same time frame as I, and he received a

3    bonus.

4     Q.    Okay.  And did you feel that way at the time in

5    2007?

6     A.    I did.

7     Q.    Did Steve Plunkett, by the way, have the alcohol

8    responsibilities that you had?

9     A.    Steve Plunkett had similar job responsibilities.  I

10    was asked to mentor him on the alcohol program.  So he didn't

11    have -- he had similar as far as my in-house demo coordinator

12    duties, yes, but he had taken on some additional roles of his

13    own.

14     Q.    How much of your job was the alcohol

15    responsibilities versus the in-house demo coordinator

16    responsibilities?

17     A.    The alcohol side was more of my responsibility

18    because when Denise came on, she kind of structured --

19    restructured everything off the record.

20     Q.    How much -- would you say 90 percent of your job was

21    the alcohol responsibilities and 10 percent demo?

22     A.    I would say 80 percent, 85 percent, and 15 percent

23    for demos.

24     Q.    And the remaining would be the alcohol

25    responsibilities, about 85 percent?

Page 67

1      **A.     About 85 percent.**

2      Q.   Now, on August 20th, 2007, and I am looking at the

3   bottom half of Page Plaintiff Dep 003, this describes when

4   you notified Joe and other individuals of your intent to

5   resign?

6      **A.     Exactly.**

7      Q.   And at the time that you were intending to resign,

8   did you feel that you were being discriminated against based

9   on your race?

10      **A.     Yes, I did, and I did notate that in my resignation**

11   **letter.**

12      Q.   Did you feel you were being discriminated against

13   based on your gender?

14      **A.     Yes, I did.**

15      Q.   And what did you note about your belief that you

16   were being discriminated against in your resignation letter?

17      **A.     I noted that there was unfair treatment going on.**

18   **They continually put -- added on responsibilities outside of**

19   **my job roles and duties.  I put in there that I had**

20   **developed, you know, this program for them after being asked**

21   **to, and I was promised -- I was promised things that weren't**

22   **honored.  I also put that I was being treated unfair compared**

23   **to the other in-house coordinators.**

24      Q.   Did you claim race discrimination at that time?

25      **A.     At that time I did not claim race discrimination.**

Page 69

1      A.   That's what -- he left me a voicemail -- he called

2   me and left me a voicemail and said that he got me a 15.5

3   percent increase up front.

4      Q.   And did he -- is that what the $57,000 represented?

5   Was that a 15.5 percent increase?

6      A.   Yes.

7      Q.   Okay.  So I suppose we could work backwards to find

8   out what your salary was --

9      A.   Exactly.

10      Q.   -- by taking 15.5 percent less than $57,000, right?

11      A.   Uh-huh.

12      Q.   Yes?

13      A.   That is correct.

14      Q.   Okay.  So is there anything about this series of

15   events where you intended to resign and then you were offered

16   an increase, and you accepted?  Is there anything about that

17   that you believe was discriminatory?

18      A.   Yes, I --

19            MS. JENNINGS:  Objection, form.  Go ahead.

20      A.   I am sorry.  Yes, I felt that looking back, yes, it

21   was -- there was -- there wasn't an intent for them to ever

22   honor this bonus plan that they had put me on, and that was

23   race discrimination.  It was all their tactics to get me to

24   continue to perform these duties that I was doing and also

25   mentor and train other white employees that eventually took

Page 72

1    A.    At the time I did not.

2    Q.    Okay.  When did you start to feel that that was

3    discriminatory?

4    A.    Right after I started making my complaint -- or

5    basically after they gave me this raise, then it -- they

6    started -- I noticed that I -- I incurred additional job

7    responsibilities.  So now that you have given me my increase

8    that I should have had all along, now you are adding more

9    responsibility to me that I have already -- I have already

10   taken on three different job titles.  Now that I have got my

11   increase, you are adding more responsibility to me.

12   Q.    So it was shortly after August of 2007 that you

13   started to perceive that it was discrimination that you

14   didn't get retroactive pay to 2006?

15   A.    Not necessarily just retroactive pay.  That wasn't

16   even a thought about the retroactive pay.  It was now you are

17   -- you are adding -- just because you gave me a raise for

18   something that I should have been getting all this time, I

19   have been performing all of these duties, now you want to

20   harrass me, basically, for information because you have given

21   me an increase.

22   Q.    Harrass you for information?

23   A.    Well, yes.  That's where it led up to.  They were

24   harassing me.  They were making -- they kind of made it a

25   hostile environment for me to work in, because after I

Page 73

1    received that increase, now it was like demands coming from

2    other parts of the PromoWorks business.  Now since I have

3    gotten my increase, now I have to put -- document things down

4    on templates and now I have to create spread sheets and now I

5    have to conduct conference calls and meetings and additional

6    things that all this time I haven't had to do.

7           But now since you have given me an increase, you

8    want me to conduct conference calls with -- with -- I am on

9    the Safeway account, but now I have to conduct conferences

10   with the Wal-Mart account, I have to conduct conferences with

11   the personnel on the Krogers account and the person on the

12   Costco account, so it was all of these additional roles that

13   I had taken on.

14        Q.   When did those duties begin, the additional duties?

15        A.   Directly after my increase.

16        Q.   So still in 2007?

17        A.   Still in 2007.

18        Q.   And you believe that that was discrimination?

19        A.   I do.

20        Q.   Did you at the time?

21        A.   Yes, I do.

22        Q.   Race discrimination?

23        A.   No, not at the time.

24        Q.   Gender discrimination?

25        A.   No.

Page 77

1    A.    She would only -- yes.  She was hired to be the

2    sales account -- well, actually she was -- her job title was

3    Safeway account manager, yes.

4        Q.    Is that a sales position?

5    A.    It entails some sales, yes.

6        Q.    Was Nikki based in California?

7        A.    Nikki was given a relocation package from Chicago to

8    move to California.

9        Q.    Was she -- if you know, was she an existing

10   PromoWorks employee or was she hired from outside?

11   A.    She was hired from outside.

12       Q.    Do you know whose decision it was to hire Nikki?

13   A.    Denise Decker's.

14       Q.    On her own?

15   A.    Yes.

16       Q.    Do you believe Denise had the authority to hire

17   somebody --

18   A.    Yes.

19       Q.    -- on her own?

20   A.    Yes.

21       Q.    Do you know if anybody else was involved in that

22   decision?

23   A.    I can't speculate, but I assume so.  Joe and Denise

24   worked hand in hand.

25       Q.    You don't know everybody who was involved in that

1   decision, though?

2      A.   I don't, no.

3      Q.   Were you involved in the decision to hire Nikki?

4      A.   No, I was not.

5      Q.   Do you know Nikki's qualifications or work

6   experience?

7      A.   Just what she had told us when she introduced

8   herself.

9      Q.   You have never seen her resume or employment

10  application?

11     A.   No, I have not.

12     Q.   Do you have any knowledge of her sales experience?

13     A.   No, I don't.

14     Q.   Okay.

15     A.   But I also know when Nikki was hired, that -- for

16  this position, this position was not posted within -- within

17  the PromoWorks -- it wasn't offered to any of us on the team,

18  not -- including myself, and I was very well qualified for

19  this job.

20     Q.   Because of your sales experience?

21     A.   Uh-huh.

22     Q.   Which you have described already today?

23     A.   Uh-huh.

24          MS. JENNINGS:   That's a "yes"?

25     A.   Yes, ma'am.   I am sorry.

Page 79

1     Q.   (By Ms. Stahr)  Okay.  And you write in here that

2   Denise set up client meetings for her and Nikki to go to, and

3   she did not set them up for you to go to?

4     A.   **Yes, ma'am.**

5     Q.   And you think that that's wrong?

6     A.   **Yes, ma'am, I do feel that that was very wrong for**

7   **her to do that.**

8     Q.   Did you believe it was racially discriminatory for

9   her to do that?

10    A.   **Yes, I do believe that that was racially -- racial**

11  **discrimination, race -- well, it's race.**

12    Q.   Was it based on gender discrimination as well?

13    A.   **I wouldn't say gender because Nikki is a female, but**

14  **I would say it was racial discrimination, yes.**

15    Q.   And did you feel that way at the time?

16    A.   **Yes, I did.**

17    Q.   So back in 2007 and 2008 when Nikki was hired, you

18  felt that it was discriminatory that she was brought to

19  client meetings and you were not?

20    A.   **It's not necessarily the client meetings that was**

21  **discriminatory, it was the way Denise handled Nikki as far as**

22  **setting her up to meet clients, allowing her to have a budget**

23  **to travel to meet clients, introducing her to my clients that**

24  **I dealt with on the alcohol when Nikki was hired for the food**

25  **side account.**

1    office helping her, so she didn't do all of her roles and

2    responsibilities like I was responsible for all of my roles

3    and responsibilities.  Hers were dispensed out amongst the

4    people that were in the Safeway office with her.

5         Q.   Well, it sounds like there was an opening that they

6    needed to fill in the food sales side, right?

7         A.   It wasn't -- no, it wasn't an opening, because

8    that's actually what Denise was hired to do.  Denise was

9    supposed to be doing that position, and instead they hired

10   Nikki to basically be her assistant when Denise was assisting

11   Joe as well, so --

12        Q.   Well, I am trying to understand your objection to

13   what happened here.  Is your objection that they hired Nikki

14   to do it instead of Denise doing it?

15        A.   I wouldn't object to that, no.

16        Q.   So what is your objection to them hiring Nikki to do

17   that job?

18        A.   That position was not posted within the company for

19   us to apply for.

20        Q.   Your objection is that you wanted that job?

21        A.   I was qualified for that job, and that job was not

22   offered to me, that's -- that's what I am saying.

23        Q.   So you are saying that you wanted that job instead

24   of the job you had?

25        A.   No, not necessarily.  I am not saying that.  I am

Page 82

1   saying that in all fairness, when a position becomes

2   available within a company or a position is created within a

3   company, everyone should have the opportunity to apply for

4   that position if they feel they are qualified, and that

5   didn't happen.

6        Q.   They didn't post the job to anybody internally,

7   correct?

8        A.   They didn't post the job -- they didn't post a lot

9   of jobs.  We never knew about jobs.  It was just somebody

10  would fill those jobs or they would make an announcement

11  that, you know, a job had been filled.

12       Q.   Okay.

13       A.   If it was open, we never knew about it.

14       Q.   Okay.  And is that a job you would have applied for

15  had you known about it?

16       A.   Yes, it would have been.

17       Q.   Is that a job you wanted, then?

18       A.   Yes, it would have been a job that I wanted because

19  it was -- I was basically doing those duties anyway.  I was

20  doing -- I was doing those duties along with my alcohol

21  duties, so --

22       Q.   So that Nikki actually took some duties away from

23  you that you were having to do?

24       A.   Nikki took on food side demos, but not from my desk,

25  because I was still doing those duties locally.  Nikki just

Thompson Court Reporters, Inc
(312) 421-3377

1    A.    Well, I was told that -- I was told that Jennifer

2  Burgess -- I reported to Jennifer Burgess.

3    Q.    For the food demo side?

4    A.    No.   I was told that she was my direct boss.

5    Q.    When were you told that?

6    A.    That was told to me by Frank Colosi after my

7  complaint.

8    Q.    Okay.

9    A.    But all that time prior to my complaint I was

10  reporting to Jen, like when I would leave to go on vacation.

11  I was also reporting to Denise Decker and Jillian Plummer.

12  So again, I had many people that I would report to.

13    Q.    Okay.   So back to this conversation with Denise

14  around March 27th of 2008 about your bonus.

15    A.    Uh-huh.

16    Q.    Did you start to feel at that time that there was

17  some form of discrimination occurring regarding your bonus?

18    A.    This was definitely discrimination going on now

19  because now we are in another year.   I didn't receive a bonus

20  in 2007.   Now I have it in writing that I should have

21  received one in 2008.   And the only reason why I found out on

22  March 27th of 2008 that they had already been handed out is

23  because Rex had -- as I stated before, Rex and I worked on

24  several programs and projects with Safeway corporate to get

25  the alcohol set up, the alcohol Texas set up, so he knew that

1    I was supposed to receive a bonus.

2            And he e-mailed me and said, "Did you get your bonus

3    yet?  You know, you should have gotten it.  It should have

4    been good, you know."  And he kind of hinted that the bonuses

5    had already went out.  And I was expecting a bonus in April,

6    which was what I was told, that they went out in April.

7        Q.   When was it that you started to believe that your

8    not getting a bonus in April was racially discriminatory?

9        A.   Oh, I felt that right up front because --

10       Q.   Right in April of 2008?

11       A.   In April after I didn't receive my bonus and I

12   questioned it with Denise and Joe, it was very evident and

13   clear that there was no intent to ever give me a bonus even

14   after they put it in an offer letter.

15       Q.   And you believed that that was racially

16   discriminatory?

17       A.   Yes, I do because --

18       Q.   Did you believe that was gender discrimination?

19            MS. JENNINGS:  Let her finish her answer.

20       A.   Yes, I do, because Jennifer Burgess had received a

21   bonus.  Nikki Leigh had just come on board and received a

22   $4300 bonus.  Rex Chaney had -- white male, had received a

23   bonus.  Steve Plunkett, white male, had received a bonus.

24       Q.   (By Ms. Stahr)  If I asked you why do you believe,

25   then that would be the answer.  Right now I am just asking

1   you if you believe in April of 2008 that your failure to

2   receive a bonus was racially discriminatory.

3       A.   **Yes, I do.**

4       Q.   Did you believe that it was discrimination based on

5   your gender also?

6       A.   **Yes, I do.**

7       Q.   And who do you believe discriminated against you in

8   terms of not giving you a bonus in April of 2008?

9       A.   **Whoever was responsible for issuing those bonuses**

10  **out.**

11      Q.   Do you have any knowledge of who those individuals

12  were?

13      A.   **That would be -- well, the person who made me the**

14  **offer, which came from Joe Szala, Mike Kent and Jon Bos.**

15      Q.   Who made you the offer?

16      A.   **The offer was made initially by Joe Szala in 2007**

17  **with the offer letter.**

18      Q.   You mentioned Mike Kent and Jon Bos.  Did either one

19  of them make you an offer or --

20      A.   **They discussed it with Joe.  Joe -- that's what he**

21  **had to get approved prior to giving me that offer and putting**

22  **it in an offer letter.**

23      Q.   Did Mike Kent discuss with you personally the offer

24  letter that was given to you in August of 2007?

25      A.   **We never discussed anything personally because**

1    Q.   Could we stick with the bonus?

2    **A.   Uh-huh.**

3    Q.   I am going to get to all of this, but stick with if

4    PromoWorks ever stated a reason.  I know that you are giving

5    me your belief as to the reason, but I want to know if

6    anybody from PromoWorks ever told you a reason.

7    **A.   They told -- Joe told me that I wasn't ratified in**

8    **the system, that I had not been input into the system.**

9    Q.   Okay.  And were you told any other reason about the

10   2008 bonus not being received?

11   **A.   No, not at that time.**

12   Q.   Okay.  If you can look back to around Plaintiff Dep

13   006.

14   **A.   Uh-huh.**

15   Q.   Now, there is an entry here that says "on Thursday,

16   May 8th" at the bottom.

17   **A.   Uh-huh.**

18   Q.   I don't see an entry for May 2nd, and you said that

19   you called Frank Colosi on May 2nd.  Could that have been May

20   8th?  And take your time and read it.

21   **A.   Yes, that would have been May 8th.**

22   Q.   So May 8th was when you telephoned Frank Colosi to

23   talk about the bonus?

24   **A.   Frank Colosi, yes.**

25   Q.   And is this write-up here accurate?

Page 95

1    **A.    Yes.**

2    Q.    Did you complain about race discrimination at that

3    point?

4    **A.    At that point, no.**

5    Q.    Did you complain about gender discrimination at that

6    point?

7    **A.    No, not at that point.**

8    Q.    Okay.

9    **A.    It was strictly about the bonus.**

10   Q.    Did you believe at that time that this was a result

11   of race discrimination?

12   **A.    Yes, it was becoming very evident.**

13   Q.    Did you believe it was a result of gender

14   discrimination?

15   **A.    Yes, I do.**

16   Q.    And then between February and May of 2008, you write

17   here in the middle of 007 that this was when you were

18   approached and asked about processes and procedures and to

19   document things?

20   **A.    Yes.**

21   Q.    Did you ever apply for a different position at

22   PromoWorks?

23   **A.    There weren't any positions ever open for us to view**

24   **and apply for.  They never posted positions at PromoWorks.**

25   Q.    So the answer is no?

1    herself.  So she was basically funneling the information from

2    me to make it appear as if she was doing the sales for my

3    account after that point on.

4        Q.   So Denise was your supervisor, correct?

5        A.   Yes.

6        Q.   And Joe was Denise's supervisor?

7        A.   Yes.

8        Q.   And Mike Kent was Joe's supervisor?

9        A.   Jon Bos and Mike Kent, yes.

10       Q.   Jon Bos and Mike Kent were both Joe's supervisor,

11   correct?

12       A.   Yes.

13       Q.   And Denise's problem was she didn't want you to

14   communicate with your upper level supervisors directly?  She

15   wanted the communications to go to her first?

16       A.   Yes, ma'am.

17       Q.   Okay.  The next page, 009, Wednesday, May 21st,

18   Denise came to the Randalls office to observe.  I take it

19   this was during the same trip, right?

20       A.   Yes.

21       Q.   This was the following day, May 21st, 2008?

22       A.   Yes.

23       Q.   And you played a voicemail for her?

24       A.   Yes.

25       Q.   What voicemail did you play for her?

Page 99

1      **A.    Yes.**

2      Q.    Was Denise in the office with you?

3      **A.    Denise was at the hotel.**

4      Q.    So this was a three-way call with each of you in

5      different locations?

6      **A.    Yes, uh-huh.**

7      Q.    Did Denise know that you were recording the

8      conversation?

9      **A.    No, she did not.**

10     Q.    Did Joe know you were recording the conversation?

11     **A.    No, he did not.**

12     Q.    And did you feel you needed to record it because

13     that race discrimination -- excuse me.  Did you feel you

14     needed to record it because race discrimination was

15     occurring?

16     **A.    I felt like I needed to record that conversation**

17     **because, again, promises had been made in the past verbally**

18     **that had not been honored.**

19     Q.    And did you also feel that gender discrimination was

20     going on at this time?

21     **A.    Yes, I did feel gender discrimination.**

22     Q.    Okay.  And what happened during that conversation?

23     Did Joe give you an explanation about the bonus or did he

24     still say he didn't know?  What was happening?

25     **A.    Well, Joe basically stated that it was something**

Page 110

1    A.    In 2007, yes.

2                (Perkins Exhibit No. 9 was marked.)

3    Q.    Okay.  Perkins 9 is PW-0214 and 215.  What is this?

4    A.    **This is my written letter of grievance complaint.**

5    Q.    To Frank Colosi?

6    A.    **To Frank Colosi.**

7    Q.    Dated August 8th, 2008?

8    A.    **Yes, ma'am.**

9    Q.    And you are complaining of race discrimination

10   against PromoWorks?

11   A.    **Yes, I am.**

12   Q.    And is this the first complaint you made where you

13   identify race discrimination?

14   A.    **No, it was not.**

15   Q.    When is -- what other complaint had you asserted

16   prior to this where you identified race discrimination?

17   A.    **I had spoken with him verbally prior to August 8th.**

18   Q.    When was that?

19   A.    **I don't recall, but I know it was sometime the first**

20   **week.  This was August 8th, so this was on a Friday.  So I**

21   **can't speculate on the date, but it was maybe like a week**

22   **before, and I had placed a call with him and spoken with him**

23   **verbally.**

24   Q.    And you identified race discrimination in that call?

25   A.    **Yes, I did.**

1  Q. And that was about a week before this e-mail dated

2 August 8th, 2008?

3  **A. Yes, ma'am.**

4  Q. Was that phone call to Frank the first time you

5 identified race discrimination --

6  **A. Yes, ma'am.**

7  Q. -- in a complaint to PromoWorks?

8  **A. Yes, ma'am.**

9  Q. And what did Frank -- did Frank respond to you when

10 you sent this e-mail?

11  **A. He did respond, and he told me that he would**

12 **investigate.**

13  Q. Okay.  Did he ask you to put any information in

14 writing?

15  **A. Yes, he did.  And that's what generated this letter,**

16 **because I had put -- we had spoken -- we had spoken verbally,**

17 **and then he asked me to put it in writing, and then he asked**

18 **me to put my details in writing once more.**

19  Q. Okay.  So when you first phoned him and complained

20 of race discrimination, that's when he asked you to put a

21 complaint in writing?

22  **A. Yes.**

23  Q. And that's when you wrote this e-mail dated August

24 8th, 2008 --

25  **A. Yes.**

Page 112

1    Q.    -- that you have in front of you, 214 and 215?

2    A.    **That is correct.**

3    Q.    And then he asked you for more written details?

4    A.    **Correct.**

5          **(Perkins Exhibit No. 10 was marked.)**

6    Q.    And I believe that would be what you see here in

7    Plaintiff's Exhibit 10 marked PW-212 and 213.  Is that what

8    you submitted to Frank in response to his second request for

9    something in writing?

10   A.    **Correct.**

11   Q.    Under conduct that's discriminatory on PW-212, in

12   number one you say "Denial of bonus in 2007, no target goal

13   set in 2007," right?

14   A.    **Correct.**

15   Q.    Have you already told me everything that you believe

16   is discriminatory about the denial of bonus in 2007?

17   A.    **No, I haven't.**

18   Q.    Okay.  Could you explain what else you think is

19   discriminatory about the denial of bonus in 2007?

20   A.    **I received my bonus goals after they told me that my**

21   **bonus would be based off of goals.  It was never put in the**

22   **offer letter, but that was one of the reasons why they said I**

23   **didn't receive the bonus in 2007.  So I was told that -- in**

24   **May of 2007 when we had the audio recorded conversation with**

25   **Joe Szala that he would put together some goals for me**

1   because I had made the complaint, they gave me some bonus

2   goals eight months into the year.  I didn't receive my bonus

3   goals until August 20th of 2008 when everyone else had

4   received their bonus goals in April.

5       Q.   In retaliation for what, complaining about your

6   bonus?

7       A.   Making my complaint, yes, of race discrimination.

8       Q.   Okay.  So you believe that your complaint to Frank

9   in August of 2008 -- that you were retaliated against for

10  making that complaint by being given bonus goals that month?

11      A.   That was a form of retaliation in my eyes because it

12  wasn't given to me until after.  We had a private

13  discussion.  He told me everything was confidential that we

14  had discussed, even -- he noted that.  And even in our call

15  he said that the conversation that we had was confidential.

16           But only after I addressed this with him, then

17  Denise comes with a set of goals that she gave me and said

18  that I needed to follow in order to -- and meet these goals

19  and objectives in order to receive my bonus for 2009.

20      Q.   I understand.  Okay.  So after you complained to

21  Frank, and included in your complaint was the bonus issue,

22  after that Denise came to you and gave you bonus goals,

23  right?

24      A.   She did.

25      Q.   Did Denise say anything about the complaint that you

Page 121

1    was that just written to you or was it written to others as

2    well?

3         A.    I have -- I don't recall.

4         Q.    And you believed at the time you wrote this

5    complaint to Frank on August 15th, 2008 that you were

6    discriminated against based on your race because you weren't

7    reimbursed for your travel expense, time or cell phone use?

8         A.    That is correct.

9         Q.    Did you believe it was gender discrimination as

10   well?

11        A.    Yes, I do.  Again, Steve Plunkett was allowed to

12   travel and given a budget and given his bonuses.

13        Q.    No. 6, "Contracted agency that harassed and

14   threatened a lawsuit against me."  You're talking about the

15   Christopher Clash Agency?

16        A.    Yes, ma'am.

17        Q.    Yes, I am familiar with them.

18        A.    Yes.  And I think we conversated on that.

19        Q.    "And the company never got involved in resolving the

20   dispute until after my complaint of discrimination and me

21   inquiring about seeking my own legal representation," tell me

22   what your complaint is there.

23        A.    My complaint is I had been complaining to Joe Szala

24   and Denise Decker on this company sending me harassing

25   e-mails and constantly threatening to go to the TABC and

Page 122

1    things like that saying that PromoWorks was breaking the law,

2    but that was out of my control.  I had nothing to do with

3    contracting them from the beginning.

4         And for them to contact me -- the reason why they

5    were contacting me is because they thought I was a Safeway

6    employee because my I.D. -- my name tag was Safeway.  So they

7    actually were funneling all the e-mails thinking I was the

8    Safeway contact as well as e-mailing yourself and whoever

9    else they were e-mailing on the PromoWorks side with their

10   complaints.

11        Q.   What do you believe was discriminatory on

12   PromoWorks' part about the situation with the Christopher

13   Clash Agency?

14        A.   Because Denise and Joe allowed that to continue to

15   go on.  They let that go on and they let them assume that I

16   was a Safeway employee so that I could stop the e-mails in

17   its tracks and keep it from going to Safeway corporate.  To

18   me that was race discrimination and that was -- that was

19   discrimination because why would you allow them to continue

20   to harrass me and not correct the problem and tell them that

21   I was a PromoWorks employee as well so they would stop and

22   get someone else involved.

23        Q.   And -- oh, go ahead.  Are you done?

24        A.   Yes.

25        Q.   When did you tell Joe or Denise about the problem

Page 123

1   that you were having with Christopher Clash?

2       A.   I don't recall, because I would forward them the

3   e-mails as I was receiving them.  I was first getting phone

4   calls and then I started getting the e-mails.

5       Q.   And you don't think they acted quick enough, is that

6   what you are saying?

7       A.   They let it go on until I made this complaint.  And

8   once I made the complaint, then that's when it started being

9   addressed.

10      Q.   It was addressed, correct?

11      A.   Eventually it was addressed.

12      Q.   The Christopher Clash Agency stopped contacting you?

13      A.   Yes.

14      Q.   Okay.  You're aware that I wrote a letter, that the

15  company invested time and money and legal fees to have me get

16  involved in that situation?  Are you aware of that?

17      A.   I was aware of that, yes.

18      Q.   And you believed at this time on August 15th of 2008

19  that you were racially discriminated against because of

20  PromoWorks' failure to act quicker, is that what you are

21  saying?

22      A.   Act quicker on the Christopher Clash incident?

23      Q.   Yes.

24      A.   I feel that they misled that agency to think that I

25  was a Safeway employee, and they could have stopped that in

Thompson Court Reporters, Inc
(312) 421-3377

Page 125

1    but they probably would have funnelled the e-mails toward her

2    since she was my director.  I mean, she was my upper

3    supervisor.  It probably would have stopped with me since I

4    am not a supervisor.

5       Q.   And Christopher Clash Agency was e-mailing you about

6    their belief that there was some non-compliance with an

7    alcohol law, right?

8       A.   That wasn't the original claim.  The original claim

9    was because I was the point person for Safeway, someone --

10   Mark Reed at PromoWorks had gone out and contracted them

11   without verifying that they had the proper licensing to

12   execute the alcohol demos in Safeway.

13          A part of my job and a part of the handling of the

14   promotional permits and the -- and the licensing and

15   everything, I handled all of that for Safeway, Safeway

16   corporate.  Safeway corporate let me be in charge of that.  I

17   kept everything -- I made sure that the agencies had their

18   licenses, the proper permits.

19          That was kept in a file on my desk, and not even at

20   PromoWorks.  So when they went out -- Mark Reed went out and

21   contracted the agency, he -- normally I was -- that was the

22   process that I had, but they took that process over.  And so

23   when they took that process over, he didn't verify to see if

24   they had the proper licensing.

25          So when I called to verify to get the license so I

1   could put it in my file, they didn't have the permit, and

2   that's what generated all of that.

3        Q.   So when you say "contracted agency that harassed and

4   threatened a lawsuit against me," you're not talking about

5   race harassment?  You don't think Christopher Clash harassed

6   you based on race?

7        A.   No, I don't.

8        Q.   Or gender?

9        A.   No.

10        Q.   Okay.  "Non-black persons treated more favorably,"

11   and you have a list of seven people here.  Is there anybody

12   else that you believe was non-black and was treated more

13   favorably?

14        A.   Jillian Plummer.

15        Q.   She is on here.  She is number two.

16        A.   This looks to be accurate.

17        Q.   Okay.  And this document sets forth your complaints

18   of race discrimination as of August 15th, 2008, correct?

19        A.   Yes.

20             (Perkins Exhibit No. 11 was marked.)

21        Q.   Perkins 11 appears to be an e-mail from you to Debra

22   Jennings; is that right?

23        A.   Yes.

24        Q.   And you are forwarding something for the files,

25   right?

Page 127

1        A.    Correct.

2        Q.    You are forwarding an e-mail from Jennifer Burgess,

3   it looks like?

4        A.    Yes, correct.

5        Q.    And the e-mail is dated September 4th, 2008,

6   correct?

7        A.    Yes.

8        Q.    Is it fair to say that Ms. Jennings was your lawyer

9   as of September 4th, 2008?

10       A.    I don't recall if I had already retained her as a

11   lawyer, but I was speaking with her, yes.

12       Q.    When is the first time you consulted a lawyer

13   regarding possible claims against PromoWorks?

14       A.    I don't recall the exact date.

15       Q.    Was it -- I am sorry.

16       A.    It was in 2008, but I don't recall the exact date.

17       Q.    Do you recall if it was before you made your

18   complaint of race discrimination to Frank Colosi?

19       A.    No, it was not.

20       Q.    It was after that?

21       A.    I don't recall.  I don't recall the date.

22       Q.    Except that it was in 2008?

23       A.    Yes.

24       Q.    Was it before December of 2008?

25       A.    I don't recall.

Page 128

1     Q.   Well, this is dated September 4th of 2008.  Do you

2   have a relationship with Ms. Jennings outside of the

3   attorney/client relationship?

4       A.   No, I don't.

5       Q.   Why were you forwarding this e-mail for your file to

6   Ms. Jennings?

7              MS. JENNINGS:  Objection.  That goes into, I

8   think, privilege.

9              MS. STAHR:  It looks like the privilege has

10  been waived at least as to this document, if not more.

11      A.   **This involved my employee evaluation on September**

12  **4th of 2008.**

13      Q.   (By Ms. Stahr)  And why were you forwarding it?  Did

14  you think it had some legal relevance?

15      A.   **Yes, I did.  Obviously I did at the time.**

16      Q.   This appears to be an e-mail scheduling a date for

17  your 2008 employee evaluation; is that correct?

18      A.   **That is correct.**

19      Q.   Why did you believe that there was something

20  discriminatory about the evaluation when you hadn't received

21  it yet?

22      A.   **Because up until this point I had been getting**

23  **retaliation for making my complaint.  And I had received**

24  **several, I would say, indications from Denise that now since**

25  **I have made my complaint, certain things that I have been**

1    PW-0036.  Is this the review that was handed to you in

2    September of 2008?

3        **A.    Yes, it appears to be.**

4        Q.    And do you recall the specifics of any conversation

5    that was had by Denise or Jen about this review?

6        **A.    Yes, I do.  Actually I have an audio recording of**

7    **it.**

8        Q.    Okay.  When did you first start to make your audio

9    recordings of people at PromoWorks?

10       **A.    In May of 2007.**

11       Q.    Why did you start to do that?

12       **A.    Or May of -- I am sorry.  I don't recall at this**

13   **time, I don't.**

14       Q.    Why did you start to record employees of PromoWorks?

15       **A.    Because promises had been made that had not been**

16   **kept.  Also there was a lot of retaliation and race**

17   **discrimination going on, and I felt that -- it was my belief**

18   **that nobody was believing me.  When I was making my complaint**

19   **with Frank, his whole turn on the events is -- when he did**

20   **his investigation was that nobody was discriminating against**

21   **me.**

22       Q.    Can you repeat that, please?  What Frank said?

23       **A.    What Frank said.**

24       Q.    Okay.  And why did you bring an audio recording to

25   your performance review?

Page 134

1    A.   Because I felt the need to record it.  I knew that

2    there would be some negative things said because of what led

3    up to this point after my complaint.  I had never had a

4    negative review before.  I had never done anything on my

5    performance -- all of my reviews up until this point had been

6    good, everything.

7         I was also during this evaluation evaluated on

8    things in here that I shouldn't have been, so I did feel the

9    need that I needed to be recording -- I needed to record it.

10   Q.   Were you intending to use those recordings as

11   evidence in a race discrimination case?

12   A.   My intentions were to prove that race discrimination

13   and gender discrimination was going on.

14   Q.   Were you aware of a company policy prohibiting

15   recording devices in the workplace?

16   A.   No, I wasn't aware of that.

17   Q.   And I take it nobody at PromoWorks was aware that

18   you were making these recordings?

19   A.   No, ma'am, they weren't.

20   Q.   Were you ever in the same room with somebody when

21   you made the recordings, or were they all over the phone?

22   A.   No, I was not.  They were in Chicago and I was

23   located in Texas.  We never met face to face.

24   Q.   Are you aware that Illinois has a two-party consent

25   law regarding audio taping people where it is against the law

Page 135

1   and it's a criminal violation if you record somebody without

2   their knowledge?

3       A.   **Most of my recordings weren't conducted from**

4   **Illinois.  Most of the recordings that I had were conducted**

5   **with Denise in Arizona or in -- or in Colorado with Jen or --**

6       Q.   You recorded Joe Szala in Chicago, correct?

7       A.   **That is correct, but I was not aware of that law.  I**

8   **don't know the legalities.**

9       Q.   Do you find anything racially discriminatory about

10  this review, that's written in the review, any mark or

11  specific rating that you think is discriminatory?

12      A.   **Yes, I think that -- actually the whole entire**

13  **evaluation because, first off, they told me that everybody**

14  **was rated the same.  Nobody got over threes or fours on the**

15  **evaluations.  So I am assuming that we all were rated threes**

16  **and fours or threes and twos.**

17           **But managerial skills, they rated me on managerial**

18  **skills, and they told me in the same performance review that**

19  **I was not a manager.  So why are you rating me and evaluating**

20  **me on something that you are clearly telling me that I am**

21  **not, which brought my overall performance evaluation down.**

22      Q.   Do you agree that you were not a manager?

23      A.   **No, I don't agree with that, because I did perform**

24  **manager duties.**

25      Q.   You believe you were a manager?

Page 136

1   A.   Yes, I do believe I was a manager, but they didn't

2   believe that I was a manager.   They didn't consider me a

3   manager.

4        Q.   So you were not a manager according to PromoWorks'

5   categorization of things?

6        A.   Exactly.

7        Q.   Okay.

8        A.   But they portrayed me that way with Safeway.

9        Q.   So you believed that you were performing managerial

10  duties, but you objected to being rated on managerial skills?

11       A.   I was performing managerial skills and -- but she

12  told me in the interview -- in the performance review that

13  she didn't have to rate me on this -- that she really

14  shouldn't have rated me on managerial skills, but she just

15  wanted me to know where I was so that I could work on that.

16       Q.   Okay.   Well, let's break for lunch.

17            MS. JENNINGS:   Okay.

18            (Lunch recess taken.)

19            (Perkins Exhibit No. 13 was marked.)

20       Q.   (By Ms. Stahr)   Ms. Perkins, you are still under

21  oath, do you understand that?

22       A.   Yes.

23       Q.   Perkins 13 is PW-0186, 187 and 188.   It's an e-mail

24  string.   If you could turn to the back of the e-mail first so

25  we can start with the first e-mail in the string.   It starts

Page 138

1    A.    That is correct.

2    Q.    You did write to Frank Colosi, though, it looks

3    like, the following Monday, September 8th?

4    A.    Uh-huh.

5    Q.    And that is the e-mail that appears on PW-0187,

6    correct?

7    A.    That is correct.

8    Q.    Okay.  And this was what I understand to be your

9    second written complaint of race discrimination to

10   PromoWorks, correct, or retaliation?

11   A.    This is my --

12         MS. JENNINGS:  Objection, form.  Go ahead.

13   A.    Can you re-ask the question, please?

14   Q.    (By Ms. Stahr)  Sure.  Let me backtrack a minute.

15   The first complaint you made to PromoWorks of race

16   discrimination, as I understand it, was the phone call to

17   Frank Colosi in early September 2008, correct?

18   A.    No, that's not correct.

19.  Q.    That's what I understood your testimony to be.

20   A.    No, that's not correct.  My first complaint was in

21   August of --

22   Q.    Oh, I am sorry, August of 2008.  I misspoke.  Okay.

23   A.    It was a verbal -- early August verbally, and then I

24   wrote another complaint on August 8th.  So this is exactly

25   one month later.

1    Q.   Okay.  So this is your second written race complaint

2    to PromoWorks, right?

3    **A.   This is my written complaint of retaliation.**

4    Q.   Okay.  Based on your reporting of discrimination in

5    September of 2008?

6    **A.   Of -- no, ma'am, that's not correct.**

7    Q.   Okay.

8    **A.   Based on my reporting of --**

9    Q.   I misspoke.

10   **A.   -- my verbal and my written complaint on August 8th**

11   **of 2008.**

12   Q.   I have September stuck in my head.  My apologies.

13   Let me rephrase this so it's clear.  This e-mail to Frank on

14   September 8th, 2008 complains of retaliation for making your

15   race discrimination complaint in August of 2008?

16   **A.   That is correct.**

17   Q.   Okay.  I apologize.  It took me a couple of tries to

18   get those dates right.  And this is based primarily on your

19   belief that your performance review was retaliatory?

20   **A.   Yes, ma'am.**

21   Q.   And you detail issues you have with your performance

22   review here in this e-mail to Frank?

23   **A.   That is correct.**

24   Q.   Okay.  And Frank responded to you by e-mail

25   initially that day, September 8th, 2008?  And I am looking at

1   complaint to PromoWorks?

2      A.   **This would be August 8 of 2008, so this would be my**

3   **first complaint.**

4      Q.   Okay.  So starting out with 2009, I know that you

5   have an issue with your bonus that you received in the spring

6   of 2009; is that right?

7      A.   **That is correct.**

8      Q.   What else happened in 2009 that you believe is

9   discriminatory either based on gender or race?

10     A.   **I was forced to perform job duties -- multiple job**

11  **duties outside of my title such as performing duties for**

12  **accounting.  I was forced to solicit the vendors, basically,**

13  **and collect on outstanding invoices, which was not a part of**

14  **my job.  That was accounting.**

15          **I was also -- I was also told that I could not**

16  **continue to defy, basically, is what -- the words Denise**

17  **used, and buck the system by going over her head and talking**

18  **with upper management and making complaints.  Denise**

19  **addressed me with that.  And I can't recall anything else at**

20  **this time.**

21          **There were a string of events that happened in 2009,**

22  **I mean, an overwhelming amount.  As far as mentoring and**

23  **training, there were -- I was forced to mentor and train a**

24  **lot of employees basically to take my job, because that's**

25  **what I was grooming them for.**

1          They wanted me to put things in templates, document

2    various things regarding the alcohol sampling program,

3    document that, document my day in and day out duties, and I

4    was consistently doing this every so often.  Every month they

5    wanted me to do the same thing over.

6          I was thrown project on top of project where I was

7    so overwhelmed with work, but I continued to work the hours

8    that I needed to work to get it done.  But it was just -- it

9    was just a lot that they were putting on me to make me

10   basically quit.  I think that's what they were doing.

11       Q.   Did you quit?

12       A.   No, I didn't.

13       Q.   By the way, back in 2008 you did receive a pay

14   increase at that point to $58,139, I believe; is that right?

15       A.   Excuse me, what year?

16       Q.   2008.  You received another pay increase in 2008?

17       A.   That was the three percent increase based off of

18   that evaluation, three or -- three percent, two percent.

19       Q.   In September of 2008, your increase to was

20   $58,139.90, does that sound accurate?

21       A.   I don't recall what the exact amount was, but yes, I

22   believe it to be accurate.

23       Q.   So the bonus for 2009 -- there are two documents to

24   this exhibit.  We will call this Exhibit 15.

25              (Perkins Exhibit No. 15 was marked.)

Page 151

1      Q.   So let's talk about your belief that you did not

2   receive your full bonus.  What bonus did you receive in 2009?

3      **A.   I don't recall the exact amount, but it was**

4   **something like $1700 total or $1800 total.**

5      Q.   Okay.  And was that paid -- were you ultimately paid

6   a little bit more than that, or was that paid all at one

7   time?

8      **A.   It was less.  I was paid around 1100 and something**

9   **dollars the first time.  After his investigation, they sent**

10  **me another 700 and something dollars, but it was not the**

11  **bonus that was in my offer letter that I should have**

12  **received.**

13     Q.   Okay.  I see.  So this goes back to the offer

14  letter, that you believe that you were entitled to 10 percent

15  of your salary based upon a promise made to you in the offer

16  letter?

17     **A.   Exactly.**

18     Q.   Okay.  So you are objecting to your receipt of the

19  -- what looks to be here, based on Exhibit 16, $1,995?  Does

20  that sound right?

21     **A.   I don't recall the exact amount, but I don't think**

22  **it was $1900, no.**

23     Q.   Was it close to that amount?

24     **A.   It was maybe $100 less, 1,875, something like that.**

25     Q.   Okay.  And you believe that's insufficient as well?

Page 152

1    A.    Yes, ma'am.

2    Q.    Okay.  And why is that?

3    A.    First off, these bonus goals were changed, not to

4    the knowledge of myself or to Frank Colosi, and was put into

5    my file.  At no point in time was I ever notified that the

6    bonus goals were changed and Frank wasn't notified that the

7    bonus goals were changed until I brought the issue up about

8    the amount of the bonus and questioned why was I receiving

9    that amount.

10          And the question was, first off, why I didn't

11   receive the 52 -- or $5700 based off of what they had

12   promised.  Then I was told that it was because the company

13   didn't meet their goal.  I met my personal goal, so why

14   didn't I receive the 50 percent as promised?

15   Q.    Okay.  So when you say the goals were changed, are

16   you talking about number two under performance goals?

17   A.    I am talking about number two, yes.

18   Q.    Any other goal that was changed?

19   A.    That was the only goal that was changed.

20   Q.    So tell me how it was changed.  How is number two in

21   Exhibit 16 different from number two in 15?  I understand the

22   words are different, but tell me in terms of your job and

23   your expectation what was different.

24   Q.    In my goals and objectives, I was expected to meet

25   7500 demos.  Within those 7500 demos -- which I exceeded

Thompson Court Reporters, Inc
(312) 421-3377

Page 153

1    that.  I went to like over 10,000 -- they required me to --

2    which was out of my control, but they required 97 percent of

3    those to be executed in the stores.

4            That's up to the agency, but that was part of my

5    personal goal, was to make sure that 97 percent of those were

6    executed.  That was 15 percent of my bonus.

7        Q.    Okay.  So let me talk about that.  You felt that

8    that was an unfair goal to have 97 percent billable demos?

9        **A.    I felt -- yes, I felt it was unfair because I don't**

10   **have any control of the execution.  I can coordinate the**

11   **event and I can follow through on the event, but it's up to**

12   **the demo agency that staffs the event to make sure that they**

13   **execute it.**

14       Q.    And that was removed here in the goal that's on

15   Exhibit 16, it looks like to me.  That goal was removed?

16       **A.    But that's -- but we never -- I never received an**

17   **updated version.  I never received -- they never notified me**

18   **that my goals had been changed.**

19       Q.    So do you object to the fact that it was removed or

20   that you were not notified it was removed?

21              MS. JENNINGS:  Objection, form.

22       **A.    Rephrase the question.**

23       Q.    (By Ms. Stahr)  Do you object to that being removed,

24   that being total execution billable of Safeway alcohol demos,

25   97 percent?

Page 154

1    **A.    I don't object because I met the goals on both**

2    **number twos.  Regardless of how they put it, I met the 15**

3    **percent on both goals.**

4         Q.    Okay.  Well, they removed that language from Exhibit

5    16?

6    **A.    They did.**

7         Q.    Okay.  But they have language in here that says

8    "Obtain a minimum of $5,000 in POS."  Does that mean point of

9    sale?

10   **A.    Point of sale revenue.**

11        Q.    Revenue?  Okay.

12   **A.    And I brought a million dollars, over a million**

13   **dollars.  So $5,000, but I brought over a million dollars.**

14        Q.    Okay.  Did you have any discussions with anyone

15   about your bonus other than Frank?

16   **A.    No, I did not, because that was the protocol.  He**

17   **asked me to keep these confidential -- discussions that we**

18   **were having confidential.  So they were just strictly between**

19   **-- first -- well, I take that back.  I am sorry.  I did speak**

20   **with Denise, but I addressed everyone.  I wrote an e-mail and**

21   **I addressed it with everyone, and then Frank replied to me.**

22        Q.    Okay.  Do you recall when you received your bonus of

23   approximately 18 or $1900?

24   **A.    It was in two separate lump sums, because when they**

25   **realized that I met the goals of both of these, they changed**

Page 156

1    and 18.

2                    (Perkins Exhibit Nos. 17 and 18 were marked.)

3        Q.    Perkins 17 is PW-201, 202, 203 and 204.  Do you have

4    all those pages in front of you?

5        A.    **Yes, I do.**

6        Q.    Going to 203, because there is no content on 204.

7    It appears to me that 203 is the page that has the first

8    e-mail on it in the string.

9        A.    **Okay.**

10       Q.    What is that?

11       A.    **This is the actual e-mail that I sent to Joe about**

12   **the bonus payout.**

13       Q.    And you copy to Frank, Denise, Mike Kent and Jon

14   Bos, right?

15       A.    **Correct.**

16       Q.    Okay.  Why did you decide to e-mail Joe instead of

17   Frank?

18       A.    **Because I had questioned it with Denise on a verbal**

19   **phone call, and Denise advised me to contact Joe about it.**

20       Q.    Okay.  When was that phone call with Denise?

21       A.    **I don't recall.**

22       Q.    But it was this month, approximately?

23       A.    **It was probably the same day.  I can't speculate**

24   **because I don't recall that.**

25       Q.    Okay.  Do you recall complaining of race or gender

Page 157

1    discrimination to Denise on the phone call that day, or were

2    you talking about the bonus without stating race or gender

3    discrimination?

4         **A.   Yes, we strictly talked about the bonus.**

5         Q.   Okay.  And then you write this to Joe, and you have

6    a paragraph in here at the end where you complain of race

7    and/or gender discrimination?

8         **A.   Yes.**

9         Q.   Okay.  And that is on April 17th, 2009 at 3:10 p.m.,

10   right?

11        **A.   That is correct.**

12        Q.   Okay.  And then on April 17th, that same day, Frank

13   responds to you, and he relays that a number of employees

14   have expressed unhappiness with their bonus; is that right?

15        **A.   That is correct.**

16        Q.   Do you know who makes the decisions -- the final

17   decisions about who gets bonus payments and what amount of

18   bonus?

19        **A.   I don't know that.**

20        Q.   Do you know what sort of approval processes go on or

21   the factors that the board of directors might consider in

22   terms of who gets a bonus and how much?

23        **A.   I don't.**

24        Q.   Then Frank e-mails you again above on May 5th, 2009,

25   and it looks like he is saying he is checking into it, and he

Page 158

1    would like you to submit documentation supporting your belief

2    that your bonus was discriminatory.  Okay.  Did you provide

3    any additional documentation to Frank in response to this

4    request?

5         A.   I don't recall.

6         Q.   Then on May 5th, on that same day, you respond to

7    Frank.  Now I am looking at the first page of the exhibit.

8    Is that the response that you sent him?

9         A.   It appears to be, yes.

10        Q.   Do you recall writing any different response to him?

11        A.   I don't recall exactly what was said.

12        Q.   Do you recall sending any different e-mail, or does

13   this look like the e-mails that were sent in relation to this

14   complaint?

15        A.   I can't say for sure if this is the original e-mail

16   because it's a copy, but it does sound like something that I

17   had said, yes.

18        Q.   Okay.  Did you believe that Frank was in fact

19   looking into the bonus issue for you?

20        A.   Yes, he said -- he told me that he was going to,

21   yes.

22        Q.   Did you believe that he was?

23        A.   Yes, I did.

24        Q.   And did he ultimately get back to you about the

25   bonus issue?

Page 159

1        A.    Yes, he did.

2        Q.    Okay.  This e-mail in Exhibit No. 18, Plaintiff's

3    Dep 51, is that part of his response to you about the bonus?

4        A.    I can't say regarding all the calculations that's on

5    here if this is the very document that I received, but it

6    appears to be what he typed.

7        Q.    Well, at the top it says "from Frank Colosi to

8    Shermeke Perkins."  Do you have any reason to believe that

9    subject line was fabricated or do you dispute you received

10   this?

11       A.    I don't recall because I don't have this in my

12   possession.  I don't recall.

13       Q.    Okay.  Well, this appears to reflect that you were

14   paid an additional $571.  Does that sound right to you?

15       A.    Yes, that's about right.

16       Q.    Did you respond to Frank after receiving this e-mail

17   about the bonus issue?

18       A.    I don't even recall.  I think I questioned why I

19   didn't receive the full 50 percent of my bonus, my personal

20   goal, because he said that the company didn't meet their

21   goal, that was 50 percent, as well as my 50 percent was my

22   personal goals.  And since they found that I had met my 50

23   percent of my goal, why didn't I receive the full 50 percent

24   of my bonus, and that's what I questioned.

25       Q.    So you were questioning essentially why you didn't

Page 160

1    receive five percent -- a full five percent of your salary;

2    is that right?  If 10 percent was 100 percent you thought you

3    were entitled to, but the company didn't meet its goals and

4    that was 50 percent, then that would leave an additional five

5    percent that you believe you were entitled to?

6              MS. JENNINGS:  Objection, form.

7         A.   **What I was speaking with him about was the 25 -- or**

8    **$2700 that I should have received.**

9         Q.   (By Ms. Stahr)  Okay.  You believe you should have

10   received $2700?

11        A.   **Twenty-seven -- half of the $5700.  Whatever half of**

12   **$5700 was, I should have received my 50 percent.**

13        Q.   Okay.  Because you did not dispute that the

14   company's goals were not attained; is that right?

15        A.   **I don't know if the company's goals weren't met**

16   **because no one would tell me that information.  So I don't**

17   **know if the company -- the company could have met their**

18   **goals, but that's not something that they would reveal to me.**

19        Q.   Okay.  Were you aware of the loss of the Wal-Mart

20   business in 2008?

21        A.   **I don't recall that specifically, no.**

22        Q.   Were you aware of layoffs going on in the company

23   since around December of 2008?

24        A.   **I recall a few, but that -- No, I -- I mean, I --**

25   **not specifically.  Not dates, no.  I just know that there**

Page 161

1   were some layoffs that went on throughout the time that I was

2   there.

3       Q.   Okay.  So the -- so half of $5700 is $2,850.  Can we

4   agree on that or do you want to do the math?  Can we agree on

5   that number or would you like to use my phone to do the math

6   yourself?

7               MS. JENNINGS:  Let me just do it.  I do it the

8   old-fashioned way.  Yes, I agree with that.

9       Q.   (By Ms. Stahr)  So your claim that you should have

10  received $2,850 because you believe you met 100 percent of

11  your personal goals, is that your claim as to the bonus for

12  2009?

13      A.   I do agree with that, yes.

14      Q.   Okay.

15      A.   And it says in this -- it says right here where

16  Frank Colosi typed up that "50 percent for personal goals was

17  2,864.25, for which based off of the 97 percent achievement

18  of execution goal, you were fully eligible."  So I was

19  eligible for that amount.

20               (Perkins Exhibit No. 19 was marked.)

21      Q.   Exhibit 19 is PW-185 and PW-219.  This is a letter

22  that I received from Debra Jennings dated May 6th, 2009.

23  Were you aware that this letter was sent?  I am looking at

24  the top right page right now, PW-185.

25      A.   I don't know.  I can't recall at this time

Page 166

1    A.   **After my complaint with Frank, then there were**

2    **issues with me, yes.**

3    Q.   So Denise mentioned to you that other employees had

4    been expressing concerns about you?

5    A.   **Not other employees.  She said that she was having**

6    **problems with me bucking the system.**

7    Q.   Okay.  Had she -- had she told you that she was

8    getting complaints from other managers or employees about

9    you?

10   A.   **No.  Actually there was no indication that I was**

11   **getting any complaints.**

12   Q.   Well, on PW-0038, a little lower than halfway down

13   the page --

14   A.   **Uh-huh.**

15   Q.   -- it's an item that starts, "I have had several

16   direct complaints from your co-workers on your attitude and

17   that you are difficult to work with."  Do you see that?

18   A.   **I do see that, and that's -- that, again, was added**

19   **-- these comments were added in 2009.  That's when she stated**

20   **that, but no one ever addressed me with that other than her.**

21   Q.   Okay.  So -- but that's what I was asking you.  In

22   May of 2009, Denise informed you that she had received

23   complaints from co-workers about you?

24   A.   **Uh-huh.  That was after I had complained to Frank**

25   **about her.**

Page 167

1      Q.   But the answer to that question is yes?

2      **A.   Yes.**

3      Q.   And then July 16th, 2009 is the day you were

4  terminated; is that correct?

5      **A.   July 16th, yes, ma'am.**

6           **(Perkins Exhibit No. 21 was marked.)**

7      Q.   Is this the termination letter you received?  And I

8  will mark that Exhibit 21, PW-43 and 44.

9      **A.   That is correct.**

10     Q.   The letter says here that your position was being

11 eliminated and centralized into Safeway headquarters in

12 California.  Is that accurate, an accurate summary of what

13 the letter says?

14     **A.   Yes, that's correct.**

15     Q.   Was your position actually centralized to

16 California, to your knowledge, if you know?

17     **A.   To my knowledge, I don't know.**

18     Q.   You don't know one way or the other?

19     **A.   I don't know.**

20     Q.   Okay.  Do you know who made the decision to

21 terminate you?

22     **A.   I don't know that information.  I just know what**

23 **Frank -- I know what Frank Colosi told me.**

24     Q.   In this letter?

25     **A.   In this letter.**

Page 168

1    Q.   Do you know when the decision was made to eliminate

2    your position?

3    **A.   I don't know.**

4    Q.   And did you receive this letter by mail or e-mail,

5    do you recall?

6    **A.   No.   Joe and Denise flew down with an unscheduled**

7    **visit and brought it in the day that I was let go.**

8    Q.   So they handed you this in person?

9    **A.   In person.**

10   Q.   And the explanation that they gave you for being let

11   go, was it the same thing that is written in this letter?

12   **A.   They didn't say one way or the other why I was being**

13   **let go.   They just asked me to come into a private room and**

14   **we needed to get onto a conference call, which that's what**

15   **Frank did.**

16   Q.   Okay.   Oh, Frank was on a conference call when you

17   were --

18   **A.   They called Frank from the Randalls headquarters,**

19   **which is where they came and I was let go.**

20   Q.   So your termination meeting was had with Frank on

21   the phone and Joe and Denise there with you in person?

22   **A.   Exactly.**

23   Q.   Who did the talking?

24   **A.   Frank.**

25   Q.   He did all of the talking?

Page 169

1      A.    He did all of the talking.

2      Q.    And was Frank's explanation essentially what was

3    written in this letter?

4      A.    He basically read the letter to me, yes, uh-huh.

5      Q.    Did you ask any questions?

6      A.    I did ask questions.  I asked him about his

7    investigation and his findings, and that he had promised on

8    two other occasions that he would get me a written document

9    of his findings on my race discrimination and gender

10   discrimination, and when was I going to receive that

11   information, and he said that he would send that to me.

12     Q.    Had Frank gotten back to you verbally before your

13   termination to discuss the results of your investigation?

14     A.    Yes, we had talked several times.  We talked in

15   February of 2009, and we spoke again, I want to say, around

16   March and then again in June, again in June.

17     Q.    Okay.  Were you satisfied with the results of

18   Frank's investigation?

19     A.    No, I was not.

20     Q.    Were you satisfied with Frank's efforts to

21   investigate on your behalf?

22     A.    I don't feel like he put the efforts that he should

23   have put because he didn't give me an official report from

24   August of 2009 all -- well, actually May 8th of 2008 through

25   February 10th of 2009 is when I got my first official report

Page 172

1   that?

2        **A.   Yes.**

3        Q.   Yes?  Okay.  And you said that you did not receive

4   anything different in writing and nobody discussed your

5   vacation policy with you other than what was in the handbook;

6   is that correct?

7        **A.   That is correct.**

8        Q.   Okay.  And then after you were laid off, you wrote a

9   letter to Frank and to me complaining of pregnancy

10  discrimination.  Does that sound like something you did?

11       **A.   Yes, I did.**

12             **(Perkins Exhibit No. 22 was marked.)**

13       Q.   Okay.  Exhibit 22 is Plaintiff's Dep 201, 202 and

14  203.  Is that the letter of you complaining of pregnancy

15  discrimination that I just referred to?

16       **A.   That is correct.  It appears to be the letter that I**

17  **wrote and signed, yes.**

18       Q.   Okay.  And were you pregnant at the time that you

19  wrote this letter?

20       **A.   I was pregnant.**

21       Q.   How many months pregnant were you at this time?

22       **A.   I was about a month, I guess.  I can't recall**

23  **exactly.**

24       Q.   And I understand that you told Jennifer Burgess that

25  you were pregnant shortly before your termination; is that

Page 173

1   right?

2       A.    That is correct.  I had told a number of other

3   employees that I was pregnant as well.

4       Q.    And you asked them to keep it quiet because you

5   weren't telling anybody publicly yet?

6       A.    Well, Debbie Lee and Gina Olivia, those were the two

7   that kept it confidential.  But when I was ready to release

8   that information, Jennifer Burgess was the person I was told

9   was my direct supervisor, so I advised her that I was

10  pregnant because I was beginning to become sick.  So I had to

11  let her know that I was, you know, pregnant because I was

12  sick.

13      Q.    And what day was that that you told Jennifer

14  Burgess?

15      A.    I told Jennifer -- I don't recall the exact date,

16  but it was about a week prior to them letting me go.

17      Q.    And did you tell Denise Decker you were pregnant?

18      A.    Jennifer Burgess, I am quite sure, she relayed that

19  information to Denise.  That was her direct boss.

20      Q.    Well, that's not my question.  My question is did

21  you tell Denise Decker you were pregnant?

22      A.    No, I did not.

23      Q.    Did you tell Joe Szala you were pregnant?

24      A.    No, I did not, because the protocol was for me to

25  report that to Jennifer Burgess.

Page 174

1    Q.   If I asked you why you did not, that would be an

2    answer.  But I am just asking you if you did or not right

3    now, okay?

4        A.   No.

5        Q.   Okay.  Did you tell Frank Colosi you were pregnant?

6        A.   No.

7        Q.   Did you tell Mike Kent you were pregnant?

8        A.   No.

9        Q.   Did you tell Jennifer Burgess you were pregnant?

10       A.   No, ma'am.

11       Q.   Do you have any proof that Jennifer Burgess told

12   Denise Decker you were pregnant?

13       A.   No, I don't.

14       Q.   And did Frank respond to your letter dated July

15   24th, 2009?

16       A.   Yes, he did.

17            (Perkins Exhibit No. 23 was marked.)

18       Q.   And is that the document that I have marked Perkins

19   23, PW-0129?  Yes?

20       A.   Yes.

21       Q.   Was Jennifer Burgess the only -- well, let me ask

22   you this.  Do you consider Jennifer Burgess a supervisor?

23       A.   I was told that she was my reporting supervisor,

24   yes.

25       Q.   Is she the only person who you consider to be a

Page 175

1    supervisor that you told of your pregnancy?

2        A.    **Debbie Lee was a supervisor or manager as well in**

3    **the corporate headquarters.**

4        Q.    Okay.

5        A.    **So no, I wouldn't say that she was the only manager.**

6        Q.    Okay.  Other than Jennifer Burgess and Debbie Lee,

7    who else did you tell about your pregnancy?

8        A.    **Gina Olivia.**

9        Q.    Anybody else?

10       A.    **I told a couple of people at the Randalls offices.**

11       Q.    Were they PromoWorks employees?

12       A.    **No, they were not.**

13       Q.    Any other PromoWorks employee?

14       A.    **No, I did not.**

15                  (Perkins Exhibit No. 24 was marked.)

16       Q.    That's Exhibit 24, Plaintiff Dep 87, 88, 89 and 90.

17   This appears to be a termination letter to Selina Davis and

18   some related documents relating to Selina Davis' termination;

19   is that correct?

20       A.    **That's correct.**

21       Q.    How did you obtain these documents?  And I received

22   these from your attorney.

23       A.    **Selina Davis sent these to me.**

24       Q.    And that was after her termination or before?

25       A.    **No, that was before she was terminated.  She sent**

Page 176

1    these to me upon her leaving.  She copied me because she did

2    an exit interview, and upon her exit interview she copied me

3    because we worked side by side.  So she just wanted me to

4    know that this is what was being said.

5         Q.   When you say she copied you, what do you mean?  She

6    sent you these documents?

7         A.   She sent me these documents, yes.

8         Q.   Did she send anybody else these documents?

9         A.   I don't think so.

10        Q.   Okay.  And do you recall when she sent you these

11   documents?

12        A.   I don't recall.

13        Q.   Was it after she was told about her termination?

14        A.   Yes, it was.

15        Q.   But before she actually left the company?

16        A.   Yes.

17             (Perkins Exhibit No. 25 was marked.)

18        Q.   Exhibit 25 is your EEOC charge.  Do you recognize

19   this document?  There are two pages to the document.

20        A.   Yes, it appears to be what I signed and dated.

21        Q.   So on the second page at the bottom where it says

22   "August 4, 2009," is that your signature next to it?

23        A.   That is correct.

24        Q.   And then in the box next to that where you swear and

25   affirm that the complaint is -- the charge is true, is that

1    your signature also?

2        A.    **That is correct.**

3        Q.    And that's dated August 4th, 2009; is that right?

4        A.    **That is correct.**

5        Q.    And that's when you filed your charge?

6        A.    **I don't recall the exact date, but it appears to be**

7    **August 4th, 2009, yes.**

8        Q.    Okay.  So the first sentence where you say you filed

9    a grievance about May 16th, 2008 alleging race, sex and

10   retaliation discrimination for not being promoted and not

11   receiving an incentive bonus, are you referring to the

12   complaint made to Frank about your bonus in May of 2008?

13       A.    **Yes, that's correct.**

14       Q.    Okay.  And that was the complaint you made to Frank

15   about your bonus and some other issues, but you did not

16   mention race or gender in that particular complaint, or

17   retaliation; is that right?

18       A.    **At the time that I wrote this, I didn't recall the**

19   **dates.  I just approximated the date.**

20       Q.    Okay.  So did you mean to say the August 2008

21   complaint alleging race, sex and --

22       A.    **I don't want to speculate, but that's -- that would**

23   **have been the date, yes.**

24            **(Perkins Exhibit No. 26 was marked.)**

25       Q.    Okay.  Exhibit 26 is your -- the original petition

Page 186

1    November 8th, 2011?

2         A.    No.

3                   (Perkins Exhibit No. 29 was marked.)

4         Q.    Exhibit 29 is your answers to interrogatories.

5         A.    Uh-huh.

6         Q.    On Page 6 of your answers, the section that says May

7    2007 to July 2009, do you see that?

8         A.    Yes.

9         Q.    It says "Witnesses: tape recordings, e-mail

10   documentation."  What tape recordings do you have from this

11   time period?  What conversations were tape recorded?

12        A.    That would have been -- May '07 to July 2009, that

13   would have been the recordings with Frank Colosi, the

14   recording with Joe Szala and Denise Decker regarding the

15   bonus, all the follow-ups with Frank regarding the

16   complaints.

17        Q.    You recorded all of your conversations with Frank as

18   well about your complaints?

19        A.    My evaluations, the evaluation from 2008, various

20   meetings and conferences that they had me hold, training

21   conferences.  That's all I can recall at this time.

22        Q.    Okay.  So you recorded conversations with Denise

23   Decker, yes?

24        A.    Yes.

25        Q.    Joe Szala?

Page 187

1    A.   Yes.

2    Q.   Frank Colosi?

3    A.   Yes.

4    Q.   Who else?

5    A.   Jennifer Burgess.

6    Q.   Who else?

7    A.   I believe there was one with Debbie Lee.  And I

8    don't recall the rest of them.  There were a lot of

9    recordings.

10   Q.   Had you consulted an attorney before recording these

11   folks secretly?

12   A.   At one point, no.  I started recording way before I

13   consulted an attorney because I felt I needed to record Joe

14   and Denise as we were having our discussions because there

15   was a lot of things verbally that they had promised that they

16   hadn't honored.  And that's the only reason why I started

17   recording the conversations.

18   Q.   Did you start to record these conversations when you

19   thought that you were being discriminated against?

20   A.   Yes, I did.

21   Q.   And was that as early as May of 2007?

22   A.   I don't think -- when I wrote the "Witnesses: tape

23   recordings and e-mail documentation," this is just a time

24   frame period of May 2007 to July of 2009 that I did various

25   things in this paragraph.  So it's not everything that I

Page 188

1   recorded, it's just between those time periods I have

2   recordings.

3       Q.   Do you recall when the first tape recorded

4   conversation was?

5       A.   The first tape recorded conversation was between

6   Denise Decker and Joe Szala on May the 19th of 2007.  I want

7   to say 2007 or 2000 -- 2008.  I am sorry, 2008.

8       Q.   May of 2008 was the first time you secretly tape

9   recorded these folks?

10      A.   You know what, I don't recall.  I don't want to

11  speculate because I don't recall.  It may have been 2007.

12      Q.   What kind of a device did you use?

13      A.   Just a hand recorder.

14      Q.   A dictaphone?

15      A.   I am not for sure what a dictaphone is.

16      Q.   Was it something that you connected to the phone or

17  you just held up to the phone?

18      A.   Yes, just something I held up to the phone, the

19  little cassette tapes.

20      Q.   And what would you do with the tapes once the tape

21  was full?

22      A.   Just put them away and insert another tape.

23      Q.   Where did you put them away?

24      A.   I stored them at my home.

25      Q.   And how many tapes do you have total of your

Page 189

1    conversations with PromoWorks people?

2        A.    I think there was a total of six.

3        Q.    Did you record anybody outside of PromoWorks like

4    Safeway personnel or other customers or clients?

5        A.    No, I did not.

6        Q.    Okay.

7        A.    And for the record, I did record my first

8    conversation May 19th of 2000 -- I mean, May 19th of 2007,

9    yes.

10       Q.    May 19th of 2007 was the first time you recorded?

11       A.    Yes.    That was the conversation regarding the reason

12   why I didn't receive my bonus in 2007 with Denise and Joe

13   when she came down to visit with me, and that was around the

14   19th or 20th.

15       Q.    Okay.  Did you record -- strike that.

16             On Page 13 of your answers where it says "Friday,

17   June 19th, 2009" --

18       A.    On Page --

19       Q.    Page 13.

20       A.    Okay.  Yes.

21       Q.    That was a Friday, it looks like, at least as far as

22   you wrote; is that right?

23       A.    It appears to be, yes.

24       Q.    Is that a day you were working at home?

25       A.    No, I was actually in the office this day.

Page 190

1    Q.   Okay.

2    **A.   That's why she made that comment.**

3    Q.   And what comment is that?

4    **A.   She commented, "Oh, I didn't know you would be at**

5    **the office" when I picked up the phone, as if I wasn't going**

6    **to be there.  And she said, "I thought you would be out**

7    **celebrating your freedom day."  And she kind of laughed it**

8    **off.  And I was like, "What do you mean by freedom day?"**

9         **But it didn't dawn on me, because it was just a**

10   **regular workday for me, that today was Juneteenth.  You know,**

11   **it was June 19th, and that's the day that, you know, black**

12   **people celebrate their independence.  And that's what she**

13   **kind of related to.**

14   Q.   Emancipation Day?

15   **A.   Yes.**

16   Q.   Well, Emancipation Day is April 16th.  It's actually

17   this Monday.  Why do you believe it's June -- you say it's

18   June 19th?

19   **A.   Well, Juneteenth, we celebrate our emancipation in**

20   **the south on Juneteenth.**

21   Q.   What's Juneteenth?

22        MS. JENNINGS:  June 19th.

23   **A.   June 19th of 2009.**

24   Q.   (By Ms. Stahr)  June 19th?

25   **A.   Yes.**

Page 191

1    Q.    And who is "we"?

2    **A.    African-Americans.**

3    Q.    Okay.  Do you have any reason to believe Denise

4    Decker is aware of when African-Americans decided to

5    celebrate in the south?

6    **A.    Well, she obviously was.  She obviously was.  She**

7    **said that to me.**

8    Q.    Do you believe she was aware of that because of her

9    use of the word "freedom day"?

10   **A.    That's the way I took it.  I mean, today is -- it**

11   **was freedom day for us in the south, but why would you use**

12   **that terminology, "Oh, I thought you would be out celebrating**

13   **your freedom day."  To me that was derogatory.  That was a**

14   **racial remark.**

15   Q.    Do you know how many other employees may or may not

16   have been given the day off that day?

17   **A.    It was a regular workday for all of us.  None of us**

18   **were given off that day.**

19   Q.    How do you know?  Do you know that there are no

20   employees --

21   **A.    That wasn't a paid holiday for us.  That was a**

22   **regular workday.**

23   Q.    Every so often did management say "Hey, you guys can

24   knock off early this afternoon, you can go home"?

25   **A.    That wasn't one of them.**

Page 192

1      Q.   Every once in a while did management do that?

2      **A.   They did periodically, yes.**

3      Q.   Okay.  When you worked at home, were you expected to

4  check into your voicemail or -- it was a workday for you,

5  right, when you worked at home?

6      **A.   Yes.  When I worked at home -- can you clarify your**

7  **question?**

8      Q.   You say that sometimes you worked at home?

9      **A.   Uh-huh, I did.**

10     Q.   And on those days, how did you -- how did you work?

11  Did you check into your e-mail and your office voicemail?

12     **A.   I did, yes.**

13     Q.   Do you believe that was a reasonable expectation?

14     **A.   I don't understand the question.**

15     Q.   Okay.  Well, it was a workday, right?  You weren't

16  on vacation?

17     **A.   Right, it was a workday.**

18     Q.   It wasn't a day off when you were working at home?

19     **A.   That's correct.  I was not working at home.  I was**

20  **in the office that day.**

21     Q.   I am not talking about that day any more.

22     **A.   Okay.**

23     Q.   I am talking about generally when you worked at

24  home.  You said you worked at home two or three times a

25  month, right?

1    **A.    Uh-huh.**

2    Q.    Yes?

3    **A.    Yes, ma'am.**

4    Q.    Okay.  When you worked at home, would you call in to

5    check for your messages at the office?

6    **A.    Oh, yes.  I definitely did, yes.**

7    Q.    And would you check your e-mail at the office?

8    **A.    Yes.  I had a laptop.**

9    Q.    And was that a reasonable expectation of you when

10   you were working at home to keep in contact with your office

11   communication tools?

12   **A.    Yes, it is.**

13   Q.    Still on Page 13, underneath that you say "Thursday,

14   June 16th, 2009."  Do you see that?  Page 13 at the bottom.

15   **A.    Yes.**

16   Q.    And then on the next page it goes on to describe the

17   day that you were laid off?

18   **A.    Yes.**

19   Q.    So my question is, is that an error that -- when it

20   says June 16th, did you mean to say July 16th?

21   **A.    I did mean to say July 16th.**

22   Q.    Okay.

23   **A.    That is an error.**

24   Q.    Had you consulted any lawyer prior to Debra Jennings

25   about your potential claims against PromoWorks?

Page 200

1    Q.   So her knowledge is she is aware that there was an

2  announcement that she heard that you were going to be a

3  manager?

4    **A.   I can't speculate on anything.  I don't know.**

5    Q.   Well, I am not asking you to speculate.  I am asking

6  you factually what Michelle would testify to to support your

7  claims or -- or about PromoWorks' defenses.

8    **A.   I don't know what she would testify to.**

9    Q.   How about Diane Donahue?

10   **A.   Again, I don't know what she would testify to.**

11   Q.   What knowledge does she have?

12   **A.   I don't know what she recalls from our**

13 **conversations.**

14   Q.   Okay.  Is her knowledge based on your conversations

15 with her?

16   **A.   Yes.**

17   Q.   And how about Tracy Schultz, the same thing?

18   **A.   Tracy Schultz, the same thing.**

19   Q.   Okay.

20             MS. STAHR:  Let's take five minutes.

21             (Recess taken.)

22             (Perkins Exhibit No. 30 was marked.)

23   Q.   Okay.  Perkins Exhibit 30, PW-0181, is a list of

24 individuals that have been laid off at PromoWorks since

25 December of 2008, and we have produced this to your attorney

Page 201

1    in the litigation.  And my question to you is simply do you

2    disagree or have any reason to disagree that all of these

3    individuals have been terminated as it says in this

4    document?

5         A.    I can't agree or disagree because some of these

6    individuals I don't know, so I can't agree or disagree on

7    this.

8         Q.    I understand.  I am not asking you to agree that

9    they have.  I am just asking if you have any information that

10   suggested anybody hasn't been terminated that's on this

11   list.

12               MS. JENNINGS:  Objection, I think it's been

13   asked and answered.  She didn't know.

14        Q.    (By Ms. Stahr)  Okay.  So your answer is you -- you

15   are in no position to agree or disagree with this document?

16        A.    No, ma'am, I am not.

17               (Perkins Exhibit No. 31 was marked.)

18        Q.    And the same question for Exhibit 31, Document

19   PW-0180.  This lists bonuses that individuals received in the

20   various years.  And I know that you dispute that you received

21   $1,000 in 2007 as stated on the list.  Other than yourself,

22   do you have any reason to disagree with any of the numbers on

23   this document?

24        A.    I can't answer to this question because I don't know

25   what they received.

Page 212

1    **A.   Yes.**

2    Q.   In a conference call with all the in-house demo

3    coordinators?

4    **A.   Yes.**

5    Q.   When was that?

6    **A.   When she first came on board.**

7    Q.   To your knowledge, did Mekia Williams supervise

8    anyone?

9    **A.   No.**

10    Q.   Did Mary Lou Ripper supervise anyone?

11    **A.   No, she did not.**

12    Q.   Lynn Preston, did she supervise anyone?

13    **A.   No, she did not.**

14    Q.   Did Steve Plunkett supervise anyone?

15    **A.   Steve worked side by side with me as a -- as someone**

16    **that I was mentoring and training for my position, so yes, I**

17    **would say he -- yes.  He was -- in the end, he was equal to**

18    **what I was doing because he was taking over my position.**

19    Q.   Was Steve consulted on these folks' performance

20    evaluations?

21    **A.   I don't know.**

22    Q.   Did Steve supervise anyone?

23    **A.   I don't know what he done after I left the company.**

24    **I don't know.**

25    Q.   Did Paula Dowson supervise anyone, if you know?

Page 214

1      A.    Yes.

2      Q.    And I take it you also believe that your separation,

3   your layoff from the company, was discriminatory?

4      A.    I do believe that because it was just the timing,

5   the timing of everything.  Yes, I believe that.

6      Q.    Okay.  What else do you believe was discriminatory

7   that happened in 2009?

8      A.    All the force -- the hostile environment that I was

9   working in, being forced to -- being forced to create

10  documents and templates and drilling me to put things in

11  place and to organize my desk, and all of these things that

12  they were making me do to groom someone else.

13         I mean, I was training different personnel all

14  across the board giving them my day in and day out duties.

15  All of that -- all that was a factor.

16     Q.    Anything else that you believe made it a hostile

17  environment?

18     A.    The demands of Denise, how she treated me, and the

19  unfair treatment that she gave me throughout the process and

20  before I left.  She -- I mean, she wouldn't speak with me

21  directly.  She would funnel information through Gina Olivia

22  to me, so she didn't talk to me directly.  Then all of a

23  sudden it was just no communication at all.

24         She would funnel everything through Jen Burgess and

25  tell me that that was my direct supervisor, and I was to

Page 215

1  **notify Jen Burgess of everything that I had going on and**

2  **problems that I had, so --**

3      Q.  If you could get out Exhibit 7 and Exhibit 29,

4  that's -- they are both write-ups from you.  We have gone

5  through both of these documents before, but my question to

6  you is -- and let's just take the year 2009 for right now.

7  Did you write up everything that you believe happened that

8  was discriminatory or retaliatory or harrassing in one or the

9  other of these two documents?

10           MS. JENNINGS:  Objection, form.

11     Q.  (By Ms. Stahr)  Take your time, but if you can go

12 ahead and find where 2009 starts.

13     **A.  2009?  Can you repeat the question, please?**

14     Q.  Well, and actually I don't think Exhibit 7 even goes

15 to 2009, so let's go to Exhibit 29.  And my question is on

16 the first 17 -- no, on the first 14 or so pages of Exhibit

17 29, you have a number of entries here with dates on them, do

18 you see that?

19     **A.  Yes.**

20     Q.  And my question -- I am trying to make it simple,

21 it's just not coming out that way.  But my question is in

22 terms of anything that happened to you in 2009 that you feel

23 was discriminatory or unfair, is that recorded in this

24 document?

25     **A.  No, everything is not recorded in this document.**

Page 216

1    Q.    Where else is it recorded?

2    A.    I don't -- this is not everything that was -- that

3    happened to me.  I mean, this is just part of it.  I did not

4    record everything, but I can't recall at this time the things

5    that I left out of here, so --

6    Q.    Okay.  Well, I am asking you to recall at this

7    time.  I would like to know what you think was discriminatory

8    or unfair that happened to you in 2009.  If it's in this

9    document, you can just refer to the document.  If it's not in

10   this document, I would like to hear it from you.

11   A.    Well, in 2009, that's when all the retaliation

12   started with my complaint.  I mean, part of it started in

13   2008, but they retaliated against me and forced me to

14   continue to perform job duties outside of my regular job

15   duties, kept asking me to train different personnel, all

16   white employees, training Steve Plunkett, training Gina

17   Olivia.

18         I mean, all those things would transpire after my

19   complaint of discrimination and race.  They also let me go --

20   I mean, they discharged me without any advance notice, when

21   they had given everybody else advance notice.  Prior to my

22   discharge, everybody that I knew of, all white employees,

23   Selina Davis being one of them -- I mean, they gave her

24   advance notice that her job would be going away, even linked

25   her with a headhunter.

Page 217

1          **They gave her 30 days of benefits.  When they let me**

2     **go, I did not receive benefits.  I mean, there was just a lot**

3     **of things that was going on that I was -- unfair treatment,**

4     **race discrimination as well as retaliation, and that's all**

5     **that I can recall at this time.**

6          Q.   Okay.  Well, this may be the final break.  Let's

7     take one final break, and we will wrap up after that.

8                    (Recess taken.)

9                    MS. STAHR:  No further questions.

10                   EXAMINATION

11    QUESTIONS BY MS. JENNINGS:

12         Q.   Just for the record, I am going to have just a few

13    questions for you for clarification purposes, Ms. Perkins.  I

14    refer you back to Exhibit No. 5.

15         **A.   Okay.**

16         Q.   On Exhibit No. 5, did any of these employees receive

17    their goals and objectives eight months into their -- into

18    the year?

19                   MS. STAHR:  Objection, form, foundation.

20         **A.   Not to my knowledge.**

21         Q.   (By Ms. Jennings)  You testified earlier that you

22    received your goals and objectives, am I correct, eight

23    months into the year for the year 2008, I believe?

24         **A.   That is correct.**

25         Q.   And do you know of any white employee who received